**Joseph P. CONNORS, Sr., et al., Plaintiffs,**

v.

**CALVERT DEVELOPMENT COMPANY, et al., Defendants.**

**Civ. A. No. 84–986.**

United States District Court, District of Columbia.

Nov. 25, 1985.

Rodney F. Page, David T. Dekker, Washington, D.C., for plaintiffs.

William H. Howe, Richard A. Steyer, Richard B. Fellows, Jr., Washington, D.C., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

This is an action to collect withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1001 *et seq.* (1982). Presently before the Court is a motion by plaintiffs to compel interim payment of withdrawal liability. For the reasons stated herein, the Court grants plaintiffs' motion.[1]

### I. *Statement of Facts*

Plaintiffs are the Trustees of the United Mine Workers of America ("UMWA") 1950 Pension Plan and the UMWA 1974 Pension Plan ("Plans"). The plaintiffs allege that the defendants, two West Virginia corporations, a partnership, and the former individual members in the partnership, are liable to the Plans for withdrawal liability assessed against one of the corporations.

The defendant corporations are Calvert Development Company ("Calvert") and C.C. & L. Coal Company ("C.C. & L."), both of which were engaged in the contract mining business. Calvert contributed to the Plans as a signatory to the National Bituminous Coal Wage Agreement of 1978 and 1981 ("Agreements"). Defendant C.A.M. Associates ("C.A.M.") was a West Virginia partnership of Retha Calvert, Vincent M. Calvert, Jr., Daniel K. Calvert, John Morgan, Thomas Canterbury, and Kermit Alley ("individual defendants"). Defendant Pauline Alley is the Executrix of the Estate of Kermit Alley. Neither C.C. & L. nor C.A.M. was signatory to the National Bituminous Coal Wage Agreements.

The individual defendants were the officers and controlling shareholders of Calvert and C.C. & L. Affidavit of Daniel K. Calvert ¶¶ 15(a), 16(a). "The individual defendants are all former partners in C.A.M., ... which was part of a commonly controlled group of businesses which included Calvert Development." Defendants' Opposition to Plaintiffs' Motion to Compel Interim Payment of Withdrawal Liability ("Defendants' Opposition") at 4–5.

Pursuant to its obligations under the terms of the Agreements, Calvert was a participating employer in the Plans and was obligated to and did make contributions to the Plans on behalf of its employees covered under the Agreements. Calvert ceased to be a participating employer in the Plans on or about December 23, 1981. As a result, Calvert withdrew from the Plans in a complete withdrawal as that

---

1. Pursuant to United States District Court Rules—District of Columbia, Rule 1–9(g) (1984),

term is defined in section 4203(a) of ERISA, 29 U.S.C. § 1383(a).[2]

Pursuant to Sections 1382(2) and 1399(b)(1), the Trustees notified Calvert of the amount of its withdrawal liability. By letter dated June 16, 1983, the Trustees determined that Calvert incurred withdrawal liability to the 1950 Plan in the amount of $101,647.16. Similarly, on June 20, 1983, the Trustees wrote to Calvert notifying it of withdrawal liability to the 1974 Plan in the amount of $52,096.80. Both letters included schedules determined by the Trustees according to which Calvert was to discharge its liability payments.

Calvert has failed to make any withdrawal payments to the 1950 Plan or the 1974 Plan. In addition, Calvert never requested review of the Trustees' withdrawal liability assessments within the time period required by Section 1399(b)(2)(A), and failed to initiate arbitration within the time period required by Section 1401(a)(1). The Trustees then made a second demand for payment on September 19, 1983, to which Calvert did not respond.

On March 29, 1984, the Trustees filed suit against Calvert and other defendants, seeking enforcement of their assessment of withdrawal liability against Calvert, alleging that Calvert is in default under Section 1399(c)(5). On July 9, 1985, the Trustees were granted leave by the Court to file an amended complaint which named as a defendant Pauline Alley as the Executrix of the Estate of Kermit Alley. The Trustees now move to compel defendants to make interim payments under Sections 1399(c)(2), (c)(3), (c)(5), and 1401(b)(1). The Trustees seek to have the defendants pay $153,743.96 in withdrawal liability, plus $36,126.29 in accrued interest as of September 24, 1985, continuing at $42.13 per day until payment is made.

It appears that Calvert and C.C. & L. are without assets and unable to pay any withdrawal liability. Affidavits of Vince and Daniel K. Calvert at ¶¶ 13, 14(f). The issue in this case, then, is whether the individual

an oral hearing in this matter was not granted.

partners in C.A.M., which was part of a common control group that included a withdrawing employer, may be held responsible in default for the withdrawal liability of the withdrawing employer.

## II.  *Conclusions of Law*

Section 1399(c)(2) provides:

Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

Where an employer initiates arbitration of the decision on review, Section 1401(d) provides that:

Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments or overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

■ The law is clear that withdrawal liability payments must be made by an employer according to the plan's schedule even if the employer disputes the liability. The importance of providing plan trustees with an efficient procedure to insure continued funding upon an employer's withdrawal is noted clearly at Section 1399(c)(2). A dispute over withdrawal liability does not suspend the obligation to pay, but, rather, such payment is due "notwithstanding any request for review or appeal of determinations of such liability or of the schedule." The courts have supported unequivocally this interpretation of the employer's obligation to make withdrawal liability payments. *Combs v. Miss-Ala Electrical Contractors, Inc.*, No. 85–604, slip op. (D.D.C. Apr. 18, 1985); *Thomas v. Southland Corp.*, 603 F.Supp. 1088 (N.D.Ill.1985);

---

**2.** This opinion will cite to Title 29 (in the form "Section ___"), rather than to ERISA's internal numbering.

*Trustees of the Retirement Fund of the Fur Mfg. Industry v. Lazar-Wisotsky,* 550 F.Supp. 35 (S.D.N.Y.1982), *aff'd* 738 F.2d 419 (2d Cir.1984).

In order to collect withdrawal liability, a plan must notify an employer of the amount of withdrawal liability, supply the employer with a schedule of payments, and demand payment. Section 1399(b)(1). Once the demand is made, the employer is to begin paying withdrawal liability. Although any dispute concerning the amount of withdrawal liability does not obviate the obligation to make interim payments, the language of Section 1399 is clear that no such obligation exists until sixty days after demand for payment. Section 1399(c)(2).

A plan may demand full payment of all withdrawal liability if the employer is in "default." Section 1399(c)(5). A "default" occurs when the employer does not make withdrawal liability payments to the plan and does not respond to "written notification" from the plan that the payments are due. Section 1399(c)(5)(A).

Defendants argue that under these provisions, the only defendant that could be in default is Calvert because only Calvert had an obligation to make interim payments, and only Calvert received notice of default from the Trustees. Defendants' Opposition at 8–9. Since separate notice and demand for payment of withdrawal liability was not made on all the members of the control group (*i.e.,* defendants C.C. & L., C.A.M., and individual defendants), defendants maintain that C.C. & L., C.A.M., and the individual defendants cannot be in default nor under any obligation to make interim payments.

Defendants contend that Section 1399 should be read to require that each entity, or company, of a group of businesses in common control with the employer must be afforded the statutory rights concerning notice, collection, and resolution of disputes. In other words, one entity of a commonly controlled group should not be held liable for the withdrawal payments owed by a sister entity unless the procedural rights of Section 1399 are afforded both entities.

Specifically, defendants argue that the term "employer," as it is used in Section 1399, should be read to require notice to all entities which a plan intends to hold responsible for payment of withdrawal liability. This interpretation, so defendants contend, would be "[i]n keeping with the intended purpose of the review procedures to assure all parties a fair interpretation...." Defendants' Opposition at 10.

The Court is well aware of Congress's concern that all parties be afforded a fair determination in withdrawal liability cases. *See* 1980 U.S.Code Cong. & Ad.News 2952–53. Yet, Congress also endeavored to define carefully the term "employer" as that term appears throughout ERISA and MPPAA. For purposes of ERISA, an "employer" means "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." Section 1002(5). That definition is supplemented by Section 1301(b)(1), which provides:

> For purposes of this subchapter [subchapter III], under regulations prescribed by the corporation [Pension Benefit Guarantee Corporation (PBGC)], all employees of the trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and co-extensive with regulations prescribed for similar purposes by the Secretary of the Treasury under § 414(c) of Title 26.

The PBGC regulation promulgated pursuant to this section, 29 C.F.R. § 2612, incorporates by reference the provisions of section 414(c) of the Internal Revenue Code of 1954 and the regulations issued thereunder. Section 414(c) states, in relevant part, "[A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer."

The Treasury Regulation issued under 26 U.S.C. § 414(c) provides a detailed characterization of the "control group" concept:

> The term "brother-sister group of trades or businesses under common control" means two or more organizations [the term "organization" means, *inter alia,* a partnership or a corporation] conducting trades or businesses, if (i) the same five or fewer persons who are individuals ... own ... singly or in combination, a controlling interest of each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

Temp.Treas.Reg. § 11.414(c)–2(c). "Controlling interest" for purposes of the regulation is defined to mean ownership of at least 80 percent of the stock of a corporation or profits or capital interest of a partnership. Temp.Treas.Reg. § 11.414(c)–2(b)(2). Persons are in "effective control" of an organization if

> (i) In the case of ... a corporation, such persons own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote ... or more than 50 percent of the total value of shares of all classes of stock....
>
> (iii) In the case of ... a partnership, such persons own an aggregate of more than 50 percent of the profits interest or capital interest....

Temp.Treas.Reg. § 11–414(c)–2(c)(2).

█ Calvert, C.C. & L., and C.A.M. were owned as set forth below:

| NAME | CALVERT | C.A.M. | C. C. & L. |
|---|---|---|---|
| Retha Calvert | 21.74% | 21.74% | 20% |
| Vince Calvert, Jr. | 21.74% | 21.74% | 20% |
| John Morgan | 21.74% | 21.74% | 20% |
| Kermit Alley | 21.74% | 21.74% | 20% |
| Daniel Calvert | 8.70% | 8.70% | 10% |
| Tom Canterbury, Esq. | 4.34% | 4.34% | 10% |
| Total | 100% | 100% | 100% |

Affidavits of Retha Calvert, Vince Calvert, Jr., Daniel Calvert, John Morgan, and Tom Canterbury, Esq. Thus it is clear that C.C. & L., Calvert, and C.A.M. were under common control for purposes of ERISA. All members of a commonly controlled group are treated as one employer and, accordingly, each member is jointly and severally liable for payment of withdrawal liability. Section 1301(b)(1); *Pension Benefit Guaranty Corporation v. Ouimet Corporation,* 630 F.2d 4, 11 (1st Cir.1980).

The requirement that members of a controlled group, such as defendants, be treated as a single employer means that plan trustees can operate as if defendants were one entity. In this respect, the preamble to the regulation, entitled "Notice and Collection of Withdrawal Liability," 49 Fed.Reg. 22,642, 22,644 (May 31, 1984) (codified at 29 C.F.R. § 2644), states:

> [U]nder ERISA there is a unity of interest in the case of a controlled group of corporations, since the entire group is considered to be a single employer for withdrawal liability and other purposes. Therefore, PBGC believes that a notice of default sent to the contributing entity which is a member of a controlled group of corporations, within the meaning of Section 4001(b)(1) [29 U.S.C. § 1301(b)(1)], constitutes constructive notice to the other members of the same controlled group. Thus, PBGC finds that Section 4219(c)(5)(A) [29 U.S.C. 1399(c)(5)(A)] does not require notice to the other members of a controlled group.

The Court finds this reasoning consistent with the legislative history of the MPPAA. Senator Williams, one of the principal sponsors of both ERISA and MPPAA stated:

> Under current law, a group of trades or businesses under common control, whether or not incorporated, is treated as a single employer for purposes of employer liability under Title IV. Thus, if a terminating single employer plan is maintained by one or more members of a controlled group, the entire group is the "employer" and is responsible for any employer liability.

126 Cong.Rec. S11672 (daily ed. Aug. 26, 1980).

█ It is clear that notice and demand to one is notice and demand to all. Defendants' position that Section 1301(b)(1) should read to mean that all entities of the common control group be afforded the same procedural rights as the withdrawn employ-

er must fail. Indeed, such an interpretation would void that section of any significance. The notice and demand of withdrawal liability served upon Calvert by the Trustees also was sufficient as to C.A.M., C.C. & L., and the individual defendants. It is immaterial that at the time notice and demand was made, Calvert was without assets and unable to pay withdrawal liability. Affidavit of Vincent M. Calvert, Jr. ¶ 14(f). In enacting Section 1301(b)(1), Congress intended to prevent such evasion of ERISA through the abuse of the structural formalities of overlapping business organizations. *See, e.g., Pension Benefit Guaranty Corporation v. Anthony Co.,* 537 F.Supp. 1048, 1052 n. 6 (N.D.Ill.1982) (Sections 1301(b)(1) and 1362 reflect "congressional concern that the realities of business organizations should prevail over the formalities of corporate structure in imposing liability....")

The defendants are in default pursuant to Section 1399(c)(5)(A), and, therefore, must make "immediate payment of the outstanding amount of [the] employer's liability...." Section 1399(c)(5).