**Joseph P. CONNORS, Sr., et al., Plaintiffs,**

v.

**Van MULVEHILL, Defendant.**

**Civ. A. No. 87–AR–0039–S.**

United States District Court,
N.D. Alabama, S.D.

Feb. 5, 1988.

Patrick K. Nakamura, Robert H. Stropp, Jr., Stropp & Nakamura, Birmingham, Ala., David C. Bernabucci, Asst. General Counsel, United Mine Workers of America, Health and Retirement Funds, Peter H. Gould, Deputy Asst. General Counsel, Pension Benefit Guar. Corp., Washington, D.C., for plaintiffs.

Charles L. Howard, Jr., Howard & Howard, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

The court has for consideration the motion of defendant, Van Mulvehill, for summary judgment. The court also has for consideration the motion of plaintiffs, Joseph P. Connors, Sr., et al., as Trustees, for partial summary judgment, and the motion of plaintiffs, in the alternative, to require arbitration of the present controversy. The material and controlling facts are not in dispute. The primary reason the court has allowed motions for summary judgment to be filed after the pretrial conference was the court's growing belief that the case could be disposed of under Rule 56, F.R.Civ.P. That belief is no longer tentative.

### PERTINENT UNDISPUTED FACTS

On and prior to October 27, 1981, Van Mulvehill Coal Co., Inc., was a corporation organized and existing under the laws of

the State of Alabama. All of its capital stock was then owned by Van Mulvehill, defendant herein. The corporation was engaged in the mining of coal and was a signatory to the National Bituminous Coal Wage Agreement of 1978, under the terms of which it was a "participating employer" and was thus obligated to make contributions to certain "Plans" or "Funds," commonly referred to as The United Mineworkers of America Health and Retirement Funds, which are presently managed by plaintiffs herein, Joseph P. Connors, Sr., et al, as Trustees.

On October 27, 1981, Mulvehill sold and transferred to John Calvert all of the capital stock of Van Mulvehill Coal Co., Inc. Mulvehill retained no interest whatsoever in the corporation.

The collective bargaining agreement between the corporation and the United Mine Workers had expired on March 27, 1981, removing any contractual obligation thereafter to contribute to the Funds, except, perhaps, for so-called "withdrawal liability." No contributions to the Funds were made by the corporation after March 27, 1981. If any contributions were made to the Funds prior to the expiration of the collective bargaining agreement, the actual date of the last contribution is not shown.

*Inter alia,* the written agreement by which this stock sale was effectuated on October 27, 1981, contained the following obligation undertaken by Mulvehill:

[Mulvehill] shall assume all *outstanding indebtedness owed by or obligated by the corporation,* and shall save and hold harmless [Calvert], his heirs, administrators and assigns forever, against all lawful claims against said corporation.

(emphasis supplied).

The contract also contained the following promise by Calvert:

[Calvert] shall upon the execution of this agreement, assume all control, operation and management of the corporation, and shall save and hold harmless [Mulvehill] for any and all liability, arising out of any and all future operation and management of said corporation, and the conducting of the business of said corporation shall from the date of execution of this agreement become the sole and singular responsibility of [Calvert].

The contract also contained the following language respecting the future ownership of the corporation's accounts receivable:

[Calvert] does not receive hereby any accounts receivable owed or accruing to the corporation, said accounts to become the sole and complete property of [Mulvehill].

The agreement contained no reference whatever to the Funds, or to any present or prospective corporate obligation to the Funds. For aught appearing, as of October 27, 1981, Mulvehill was blissfully unaware of any theoretically possible present or future obligation by his corporation of the kind and character here claimed by plaintiffs, and until this complaint was filed Mulvehill had no notice whatever of an alleged "withdrawal liability" or other "employer" obligation to plaintiffs or to their predecessor Trustees of the Funds.

There is no evidence whatever offered by plaintiffs to indicate any purpose by Mulvehill in selling his corporation to evade or to avoid any obligation, corporate or personal, to contribute to the Funds.

After October 27, 1981, the corporation continued its mining operations under the exclusive ownership and management of Calvert. At some undesignated time, the corporation was called upon to make contributions to the Funds which may have became due upon the corporation's "withdrawal" as provided by the Multi–Employer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381, *et seq.,* which is an addendum to the Employment Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. § 1001, *et seq.*

On July 28, 1984, Calvert died. Letters of administration were issued on Calvert's estate by the Probate Court of Blount County, Alabama on September 25, 1984, and Calvert's estate was finally settled on June 18, 1986, without any claim having been filed against it by these plaintiffs or by anyone on their behalf.

On some date after the October 27, 1981, sale, but long before Calvert's death, plaintiffs notified the corporation of an alleged withdrawal liability to the Funds in the amount of $70,075.44 and demanded payment as required by 29 U.S.C. §§ 1382 and 1399. This sum was arrived at by an *ex parte* computation by plaintiffs pursuant to 29 U.S.C. § 1391(d). The corporation thereafter failed to pay this alleged withdrawal liability, failed to furnish any additional relevant information which would be required by 29 U.S.C. § 1399(b)(2)(A) in the event the employer disputed the obligation, and failed to request the statutorily permitted review of the Trustees' determination by an impartial arbitrator under 29 U.S.C. § 1401. Under the circumstances, the corporation was in irretrievable default under 29 U.S.C. § 1399(c)(5), and was subject to an automatic judgment.

Neither plaintiffs, nor Calvert, nor any employee or representative of the corporation, ever notified Mulvehill, or called upon Mulvehill, for the purpose of giving him any opportunity to express himself or to defend either the corporation or himself during the procedures by which the final determination of corporate withdrawal liability under MPPAA was made. As could be expected under this state of facts, plaintiffs, on September 28, 1983, obtained a default judgment against the corporation in the United States District Court for the District of Columbia. This judgment was in the amount of $85,275.83. As already stated, Mulvehill received no notice whatsoever of this collection action against the corporation until the instant action against him was filed.

Initially, plaintiffs here sought to enforce against Mulvehill personally the $85,275.83 judgment which they had obtained against his former corporation. Plaintiffs now concede (1) that "due process" would require notice to Mulvehill prior to any adjudication of any sum owed by him as an alleged indemnitor of the corporation, and (2) that if this court has jurisdiction, that jurisdiction is based not on ERISA, as originally claimed, but on the diversity of citizenship of the parties.

## CONCLUSIONS OF LAW

### Jurisdiction

Plaintiffs conspicuously rely only upon one theory of liability against Mulvehill, namely, a right under the Alabama law of contract. Plaintiffs do not claim any direct withdrawal liability against Mulvehill as a statutory "employer" under 29 U.S.C. § 1383, or a secondarily liable alleged "seller of assets," under 29 U.S.C. § 1384. Plaintiffs had good reasons not to invoke 29 U.S.C. §§ 1383 and 1384 as will hereinafter appear.

Plaintiffs are correct in changing their minds and conceding that this court lacks jurisdiction under ERISA. An excellent argument can be made that this court totally lacks jurisdiction. Mulvehill has not made that argument, not only because he believes that he has an absolute defense on the merits but probably because he may not want to throw himself and plaintiffs together into the arbitration "briar patch." Following that route, an arbitrator would be called upon to rule on the MPPAA statute of limitations question, as well as on Mulvehill's liability and on the "withdrawal liability" computation itself, and Mulvehill would also suffer the uncertainty and expense of the arbitration process.

Plaintiffs invoked the jurisdiction of this court, and not Mulvehill. Now they retreat ambiguously by asking, in the alternative, that the court order the arbitration of the dispute which they themselves brought here. This change of mind is, in effect, a confession that plaintiffs may have erroneously invoked this court's jurisdiction in the first place. Plaintiffs' "fall back" position, if it can be tolerated, must be construed as a motion to dismiss the action without prejudice, because if this court lacks jurisdiction to enter a judgment on the merits, it lacks jurisdiction to order arbitration. Mulvehill cannot be ordered to arbitrate a dispute that he was never called upon to arbitrate. Plaintiffs have not attempted to perform the MPPAA prerequisites under 29 U.S.C. § 1399 which might lead to arbitration vis-a-vis Mulvehill. There is no persuasive precedent for the Funds to come

into federal court under MPPAA before making formal demand on an alleged "withdrawal liability" obligor. This court is not persuaded by *Tri-State Rubber & Equipment, Inc. v. Central State Southeast & Southwest Areas Pension Fund,* CA No. 866-70091, an unreported case decided by the District Court for the Eastern District of Michigan on November 6, 1986 [Available on WESTLAW, 1986 WL 15680], in which that court decided that "it is more efficient for me to resolve the entire controversy now than to wait for the inevitable enforcement action after arbitration," and "although this section permits me to require arbitration, it does not establish a jurisdictional bar." The issue there was whether a corporation, which itself was not a signatory of the collective bargaining agreement, was nevertheless subject to "withdrawal liability" because it was alleged to be "under common control" and therefore constituted "a single employer" with the signatory. 29 U.S.C. § 1301(b)(1).

If plaintiffs were aware of *Tri-State Rubber* when they filed their action in this court, they can be excused for believing that ERISA provided a jurisdictional basis without their first exhausting the MPPAA administrative procedures to and including possible arbitration. When plaintiffs recently learned of *Teamsters Pension Trust Fund-Board of Trustees v. Allyn Transportation Co.,* 832 F.2d 502 (9th Cir.1987), they saw a different and better reasoned view of the jurisdictional question.

There is another possible reason why plaintiffs now retreat to a request for an order requiring arbitration. Plaintiffs probably recognize their statute of limitations problem, discussed *infra,* if their action were to be dismissed without prejudice. They may think that somehow this problem would be obviated by the equitable tolling doctrine or by the law-of-the-case if this court were to order arbitration. This court thinks not.

This court disagrees with plaintiffs' ambivalence on the jurisdictional question. The court, then, disagrees also with plaintiffs' belated insistence on arbitration. This court does not disagree with *Allyn Transportation Co., supra,* cited here by plaintiffs, nor with *Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia,* 830 F.2d 1241 (3rd Cir.1987), not cited here by plaintiffs. These recent cases hold that all disputes between a pension fund and an "employer" over withdrawal liability are exclusively the subject of arbitration in instances where the "employer" is first notified of his liability and disputes it. The employer must either timely invoke arbitration or pay. But under MPPAA he must, of course, be an "employer." In *Flying Tiger Line,* the Third Circuit correctly recognizes that MPPAA mandates that " '[a]ny dispute between an *employer* and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of ... title [29] *shall be resolved through arbitration,*' " in the context of the transfer of corporate ownership between related corporate entities implicating "evade or avoid" issues under § 1392(c). *Id.* at 1244 (quoting from 29 U.S.C. § 1401(a)(1)) (emphasis supplied). If, as in *Flying Tiger Line,* "the party against which withdrawal liability is being asserted was *part of the controlled group of an employer,*" this court would properly decline jurisdiction in favor of mandatory arbitration as the exclusive means for a resolution of this dispute. 830 F.2d at 1247 (emphasis supplied). However, in the instant case plaintiffs' only theory of liability is that plaintiffs are the third-party beneficiaries of a contract. MPPAA is only tangentially involved. Plaintiffs make no attempt to allege, must less to prove, that Mulvehill was the "employer" by virtue of his status as a member of a "controlled group" of Van Mulvehill Coal Co., Inc., or any other "single employer" theory. Plaintiffs make no attempt to allege, much less to prove, that Mulvehill's sale of his corporation was a "sale of assets" under § 1384 which would only exempt a seller from withdrawal liability under certain carefully defined circumstances. And, if plaintiffs were attempting to proceed under any MPPAA theory, this court, as plaintiffs now concede, would be robbed of jurisdiction by the exclusivity of the statutory procedures for dispute resolution.

There is not the slightest suggestion that the contract which plaintiffs here attempt to invoke as purported third-party beneficiaries was part of an "evasion or avoidance" scheme by Mulvehill under the provisions of 29 U.S.C. § 1392(c). This fact also distinguishes the instant fact situation from that in *Flying Tiger Line,* but the result would be the same since *Flying Tiger Line* determined that issue to be subject to arbitration under 29 U.S.C. § 1401.

A truly interesting question might be presented in some other forum if this court should, on plaintiffs' motion, dismiss their action without prejudice and if plaintiffs should then notify Mulvehill, individually, of an alleged direct withdrawal liability under MPPAA, in order to attempt to trigger MPPAA arbitration proceedings. Nothing in MPPAA, in *Allyn,* or *Flying Tiger Line,* suggests that an arbitrator could obtain jurisdiction over and decide a claim that Mulvehill, as signatory to an Alabama contract as to which plaintiffs may be third-party beneficiaries, can be held responsible for any "withdrawal liability" of his former corporation. Under the circumstances here, (1) *either* an arbitrator must first decide the vicarious liability of a *non*-employer who assumed certain undefined employer obligations; OR (2) a court must decide the question of the liability *vel non* of the person who is claimed to have assumed a corporate obligation running in favor of purported third-party beneficiaries (with or without deciding the amount of his liability); OR (3) there is no possibility of plaintiffs' collecting any money from Mulvehill because each of the routes described in (1) and (2) is foreclosed for a different reason. Any way the problem is sliced, plaintiffs lose. These peculiar circumstances were apparently not contemplated by Congress when it enacted MPPAA. This court has nowhere found anything like this case to have been anticipated in the legislative history. Either this court has jurisdiction on diversity grounds, 28 U.S.C. § 1332, and under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* or plaintiffs find themselves on the horns of an insoluble dilemma. And if this court has jurisdiction, plaintiffs lose on the merits, as will hereinafter be demonstrated.

This court need not address the statute of limitations problem which plaintiffs would face if this action were dismissed without prejudice. Nevertheless, it is not difficult to predict that the alleged "withdrawal liability," which plaintiffs say accrued on March 27, 1981, would be barred as against Mulvehill by the MPPAA statute of limitations which provides for the later of six years after the cause of action arose, or three years after discovery of the cause of action, extended to six years after discovery in the event of fraud or concealment. 29 U.S.C. § 1451(f).

If this court has jurisdiction, that jurisdiction is based only upon the complete diversity of citizenship of the parties. The court is persuaded both by plaintiffs and by defendant that diversity forms a valid basis for jurisdiction by this court, when considered in tandem with the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

*The Meaning of the Contract; Was it Materially Breached by Calvert; and If So, What is the Effect on Plaintiffs' Claim?*

Assuming, as the court has concluded, that the court does have jurisdiction, not only can the contract between Mulvehill and Calvert not be construed so as to impose liability on Mulvehill for this particular alleged corporate obligation, but if the contract can be fairly construed to intend that benefit be conferred on plaintiffs, Calvert himself breached the contract in such a material way that it could not be enforced by Calvert. If the contract could not be enforced by Calvert, then it is not enforceable by "would-be" third-party beneficiaries who were not signatories and who contributed no consideration to the contract.

### The Dead Man's Statute

 As part of their disagreement with Mulvehill's interpretation of this Alabama contract, plaintiffs have moved to strike Mulvehill's affidavit on the ground that it violates Alabama's Dead Man's Statute, Alabama Code § 12–21–163 (1975), in that it speaks of communications between Mulvehill and Calvert during the negotia-

tions which led to their agreement, in light of the fact that Calvert is now dead. Rule 601, Federal Rules of Evidence, would preclude Mulvehill's testimony if it violates Alabama's Dead Man's Statute, Alabama being not only the state of the forum but the state where the transaction took place. The Dead Man's Statute only operates to prevent a living person from testifying about what a dead person said if that testimony would adversely affect the dead person's estate. *Edwards v. Vanzant,* 492 So.2d 990 (Ala.1986); Alabama Code § 12–21–163 (1975). The burden is upon the party who invokes the Dead Man's Statute to prove its applicability. *Hill v. Helton,* 80 Ala. 528, 1 So. 340 (1887). Mulvehill's affidavit about his and Calvert's oral expressions of intent could not adversely affect Calvert's estate. Plaintiffs have not even attempted to demonstrate a possible diminution in Calvert's estate by virtue of Mulvehill's present testimony. This indicates, perhaps, a misunderstanding by plaintiffs of the scope of the Dead Man's Statute. At the time Mulvehill executed his affidavit, any claims by plaintiffs against Calvert's estate were completely barred by Alabama's six months Non–Claims Statute. Alabama Code § 43–2–350 (1975).

Even if plaintiffs are not foreclosed as against Calvert's estate by Alabama's Non–Claims Statute because of some overriding federal policy inhering in MPPAA, the principles set forth in *DeBreceni v. Graf Brothers Leasing, Inc.,* 828 F.2d 877 (1st Cir.1987); *Connors v. P & M Coal Co.,* 801 F.2d 1373 (D.C.Cir.1986); and *Connors v. B.M.C. Coal Co.,* 634 F.Supp. 74 (D.D.C. 1986), stand solidly in the way of any claim by plaintiffs against Calvert or Calvert's estate. In *B.M.C. Coal,* the District Court for the District of Columbia said:

> Plaintiffs argue that Coleman fits the definition of "employer" set out in Title I of ERISA and thus should be personally liable in this action under Title IV. Title I provides that:
>
> > [t]he term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan....
>
> 29 U.S.C. § 1002(5). But, *the term "person" as defined in ERISA, does not include a corporate officer.* The definition includes "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). Plaintiffs recognize this, and recognize that the definition of "employer" in Title I contains the preface "For purposes of this title." They nevertheless argue that the definition of "employer" in Title I should apply under Title IV. They argue that because the definition of "employer" in Title I is the same as that found in section 3(d) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203(d), it should by analogy apply under ERISA. They rely on *Donovan v. Agnew,* 712 F.2d 1509 (1st Cir.1983) where the court used an "economic reality" test to impose personal liability for unpaid wages under the FLSA. Plaintiffs argue that defendant Coleman, as 50% stockholder and company director, exercised "final operational control" over B.M.C. and thus acted "directly [or] indirectly in the interest of an employer" and should be personally liable for withdrawal payments under ERISA.
>
> \* \* \* \* \* \*
>
> Accordingly, the accompanying Order will grant plaintiffs' motion for summary judgment as to the withdrawal liability of the corporation and will grant defendants' motion for summary judgment as to the personal liability of defendant Coleman.

634 F.Supp. at 75–78 (emphasis supplied). Calvert, as a stockholder and officer of Van Mulvehill Coal Co., Inc., was not one of any "controlled group." Plaintiffs apparently recognized the lesson of these cases by not calling upon Calvert personally while he was alive.

There is a final reason why the Dead Man's Statute does not apply here. If Calvert were ever vulnerable as a controlling person, and if plaintiffs' claim against Cal-

vert were not barred by the Non–Claims Statute, it is barred by the MPPAA statute of limitations, and therefore Mulvehill's affidavit still could not adversely affect Calvert's estate.

### The Contract Understood by Reference to Its Four Corners Alone

In the court's earlier memorandum opinion of October 8, 1987, the court indicated its belief that this contract may be ambiguous. Upon reflection, and upon a more careful reading of the contract from corner, to corner, to corner, to corner, the court finds no intention by the signatories to benefit plaintiffs.

Mulvehill's motion for summary judgment, therefore, does not depend upon his personal recollections of what he may have told Calvert or what Calvert may have told him. Although the court agrees that an ambiguity in a contract may often be resolved by parol evidence, such as that contained in Mulvehill's affidavit, this court's interpretation of the contract now would be the same whether or not aided by Mulvehill's present recollection of what the parties intended. This court finds no need for clarification. This fact makes the Dead Man's Statute irrelevant except in the event an alternative approach to the problem is required.

### An Analysis of the Contract Language

■ The court starts with the undisputed fact that the contract obligates Mulvehill only to assume *"outstanding indebtedness"* as of October 27, 1981. Notably absent is any reference to any "pension" or "withdrawal liability" of any kind. For aught appearing Mulvehill did not know on October 27, 1981, that something called "withdrawal liability" existed, or that MPPAA existed. On its face the contract did not contemplate a continuing guarantee or any assumption of inchoate or potential future obligations of the corporation arising or to become liquidated after the sale. The limited boundaries of the intent of these parties can be ascertained from the four corners of the instrument itself, without Mulvehill's personal recollections.

Plaintiffs have not indicated by pleading, by affidavit or by argument the date upon which the alleged withdrawal liability was actually *quantified*, i.e., translated into a monetary amount. Although "withdrawal liability" is a non-contractual, statutory obligation, *Debreceni v. Healthco–D.G. Stoughton Co.*, 579 F.Supp. 296 (D.C.Mass. 1984), an important fact question here is the actual date upon which it became an "indebtedness." In the first place, the word "indebtedness" implies a liquidated amount, something quantified. Strictly construed, the word indicates a sum of money due by certain and express agreement; a claim for which an action of debt will presently lie. *City of Perry v. Johnson*, 106 Okl. 32, 33, 233 P. 679, 680 (1925). The essence of a cause of action for *debt* is that the defendant be obligated to pay the obligee a then knowable sum of money. *Foshee v. General Telephone Company of the Southeast*, 295 Ala. 70, 322 So.2d 715 (1975). "Indebtedness," then, means a particular sum presently owed. It is not *a contingent liability*. See *McCrea v. First National Bank of Austin*, 162 Minn. 455, 203 N.W. 220 (1925); and *West Florida Grocery Co. v. Teutonia Fire Insurance Co.*, 74 Fla. 220, 77 So. 209 (1918). Thus, if a *contingent* liability cannot constitute an "indebtedness," it certainly cannot constitute an "outstanding indebtedness." *C.L. Downey Co. v. C.I.R.*, 172 F.2d 810 (8th Cir.1949). The word "outstanding" adds an important dimension to the contract here under analysis. This word of art only confirms Mulvehill's intent to limit the amount owed by the corporation to a particular date, i.e., October 27, 1981. See *Norton v. Lusk*, 248 Ala. 110, 26 So.2d 849, 856–857 (1946). The words "owed by or obligated by the corporation," appearing in the contract immediately following the words "outstanding indebtedness," either are redundant or were designed to reinforce the express mutual intent that Mulvehill's assumption be limited to corporate items actually *owed* or which properly should be carried on the books on October 27, 1981, as "accounts payable."

The manner of expressing Mulvehill's retention of the corporation's accounts receivable is markedly different from the manner

of expressing his assumption of the corporation's existing debt. Mulvehill retained "accounts receivable *owed or accruing to the corporation.*" (emphasis supplied). This language indicates that the contracting parties well understood the difference between items presently owed and items which might become due as a result of past acts. Otherwise, they would have used the same words in the "assumption" portion that they used in "retention" portion.

The Supreme Court of New Hampshire dealt with an analogous fact situation in *J & W Industries, Inc. v. Frank Enterprises, Inc.*, 111 N.H. 372, 284 A.2d 907 (1971). There the buyer of a "division" of a company agreed to pay the "outstanding obligations" of that division. The New Hampshire court held that the federal income tax liability attributable to the income earned by that "division" was not among the "outstanding obligations" assumed. The court reasoned that this obligation could not be "outstanding" when it was nebulous, ambiguous and dependent on future measurement.

This court agrees with the following reading of a portion of MPPAA by the District Court for the District of Columbia in *Connors v. Calvert Development Company*, 622 F.Supp. 877 (D.C.D.C.1985):

> In order to collect withdrawal liability, a plan must notify an employer of the amount of withdrawal liability, supply the employer with a *schedule of payments,* and demand payment. Section 1399(b)(1). Once the demand is made, the employer is to begin paying withdrawal liability. Although any dispute concerning the amount of withdrawal liability does not obviate the obligation to make interim payments, *the language of Section 1399 is clear that no such obligation exists until sixty days after demand for payment.* Section 1399(c)(2).

622 F.Supp. at 880 (emphasis supplied).

Applying this rationale, there was no "obligation" whatsoever by Mulvehill's corporation to plaintiffs on October 27, 1981, because no *demand* had been made. Plaintiffs' demand came long after Mulvehill had turned over both the ownership and the reins to Calvert. This statutory interpretation, however, is only an alternative reason why this potential "withdrawal liability" was not an "outstanding indebtedness" of Van Mulvehill Coal Co., Inc. on October 27, 1981.

These various judicial expressions inevitably lead this court to conclude that when the parties to the agreement of October 27, 1981, used the words "outstanding indebtedness" they did not intend that Mulvehill pay some potential, theoretical, undetermined "withdrawal" obligation which would become quantified, if at all, only after demand and after a complicated procedure which might ultimately include arbitration.

Plaintiffs have failed to meet the burden placed upon them by *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Costanza v. Costanza*, 346 So.2d 1133 (Ala.1977), construed together: Plaintiffs have simply offered no proof which could logically lead to the conclusion that this particular obligation was an "outstanding indebtedness" of Van Mulvehill Coal Co., Inc., on October 27, 1981. All undisputed facts indicate to the contrary. A court is not allowed to speculate. Plaintiffs here have the ultimate burden of proving not only that "withdrawal liability" existed on October 27, 1981 but also the burden of proving that the amount of the debt was then readily ascertainable, as well as the burden of proving how it could be ascertained. Plaintiffs cannot rely, as they seem to have done here, simply on the corporate confession made under Calvert's management, a default which may have been deliberate or may have been inadvertent, but which is not binding on Mulvehill. It is true that *Allyn, supra,* states the proposition that all members of a "controlled group" are bound by any judgment resulting from the MPPAA procedures, even though the single entity which was technically the "employer" was the only entity which received actual notice. *Allyn,* however, does not define "controlled group" so broadly as to include persons in Mulvehill's category here. In fact, this court does not believe that the Eleventh

Circuit should or would follow the *Allyn* court's idea of what might be described as vicarious "due process" by which final liability can be imposed on a person without his being part of an evasion scheme, without any prior actual notice, and without any right to be heard. This court does not believe that the *Allyn* rationale in this regard comports with the elementary rules of procedural fairness. This comment is academic, of course, in view of the fact that plaintiffs concede their inability to enforce against Mulvehill the uncollected judgment which plaintiffs previously obtained against the employer corporation.

### Clarification of Any Possible Ambiguity

■ If, for the sake of the argument, this contract on its face is deemed not to be sufficiently clear on the points in issue, then Mulvehill's uncontradicted affidavit, not barred from consideration by the Dead Man's Statute, makes clear that Mulvehill's written indemnity was not meant to cover this particular corporate liability. The controlling rule of contract construction is that where a contract is imprecise or equivocal, the court, in order to ascertain the true intent of the parties, can go outside the four corners and use sources such as parol evidence of intent. *C.F. Halstead Contractors, Inc. v. Dirt, Inc.*, 294 Ala. 644, 320 So.2d 657 (1975). Mulvehill's affidavit removes any doubt which may linger.

Another rule which operates to give to this contract, if ambiguous, a meaning which precludes the interpretation that plaintiffs place upon it, is that a contract is to be construed against a non-signing potential third-party beneficiary who was not involved in the negotiations and who contributed no consideration. This court finds no authority for this precise proposition, but believes it to be a proper rule of construction here. This principle is, or should be, a corollary to the well known proposition that a third party can sue on a contract only if the actual contracting parties intended to benefit him *directly*, in contrast to having created an *incidental* or *indirect* benefit. In this case, the *corporation itself*, which was not a party to the contract, was the only named or *direct* third-party

beneficiary of Mulvehill's undertaking. Plaintiffs, on the other hand, if beneficiaries at all, were fourth-party or *indirect, incidental* beneficiaries. *See Anderson v. Howard Hall Co.*, 278 Ala. 491, 179 So.2d 71 (1965).

In the third place, an ambiguity can be resolved by the construction placed on the contract by the parties themselves as reflected by their own subsequent actions. *See Noell v. American Design, Inc. Profit Sharing Plan*, 764 F.2d 827 (11th Cir.1985); *Hartford Accident & Indemnity Co. v. Morgan County Ass'n of Voluntary Firefighters*, 454 So.2d 960 (Ala.1984); *Dozier v. Vizard Investment Co.*, 203 Ala. 421, 83 So. 572 (1919); and *Port City Construction Co., Inc. v. Henderson*, 48 Ala.App. 639, 266 So.2d 896 (Ala.Civ.App.1972). What did Calvert do to show his understanding of the contract after he received plaintiffs' demand? Exactly *nothing!* Calvert's *non*–action speaks loudly of the construction which he placed on that provision of the contract which plaintiffs here rely upon. Calvert was a party to the contract. The Trustees of these Funds were not. Calvert's interpretation of his own contract must prevail over that of a non-party.

There is at least one other extraneous indicator of intent in this case. If Mulvehill and Calvert had anticipated or had intended to deal with a remotely possible "withdrawal liability" under MPPAA in their contract, they would or should have complied with 29 U.S.C. § 1384(a)(1)(A), (B), (C), so as to guarantee the exceptions or escape devices provided therein in the event any court might later deem the sale of the corporation as a "sale of assets," which would create "withdrawal liability" for the seller. This tends to prove that Mulvehill and Calvert were ignorant of MPPAA and therefore did not intend to provide inartfully for the eventualities which brood in MPPAA.

### Calvert's Own Breach

■ Assuming *arguendo* that the court is incorrect in its construction of the Mulvehill–Calvert contract as to Mulvehill's undertaking as to the scope of corporate obligations intended to be assumed, the very

same contract expressly required certain things of Calvert, who was the only signatory to the contract besides Mulvehill. Calvert could not, without himself violating the contract, simply ignore the Funds' demand for an alleged withdrawal liability and not call upon Mulvehill to join in responding to it. Calvert would not blithely allow a default judgment to be entered against his corporation in federal court on plaintiffs' very sizeable claim without breaching his obligation to Mulvehill. The two facts (1) that Calvert did not demand arbitration, and (2) that Calvert did not notify Mulvehill of plaintiffs' demand, either mean that Calvert *agreed* with Mulvehill's understanding of the contract vis-a-vis plaintiffs, or that Calvert did not keep his end of the bargain with Mulvehill. On the latter assumption, Calvert owed Mulvehill a duty to contest the Funds' demand, to arbitrate and/or to notify Mulvehill of a claim against the corporation which might be within the definition of "outstanding indebtedness" as of October 27, 1981. Calvert's separate written obligation to hold Mulvehill harmless "for any and all liability arising out of any and all future operation and management" would lack meaning or purpose if during Calvert's "management" he could roll-over-and-play-dead (even before he actually died) and allow a default judgment to be taken against the corporation without prior notice to Mulvehill. Calvert could not leave Mulvehill holding this bag.

Mulvehill is here analogous to an insurer. It must be kept in mind that no insurer undertakes to pay a loss without having been first afforded the opportunity to participate in defending its insured from a claim which may lead to an ultimate finding of responsibility. For aught appearing, if Calvert had notified Mulvehill at the time the corporation received the demand from plaintiffs, Mulvehill would have availed himself of several separate possible escape routes, including bankruptcy while his financial statement would allow it.

It is difficult to imagine a more material breach than Calvert's failure to comply with his own written contractual obligation to Mulvehill.

What is the present significance of Calvert's violation of his own contract? The significance is simply that a materially breaching party cannot enforce his contract against the other party. *Thomas v. Smoot,* 2 Ala.App. 407, 56 So. 1 (1911). And if Calvert could not enforce the contract, neither can it be enforced by "would-be" third-party beneficiaries who took no action to their detriment based on the contract. This well-recognized proposition is succinctly enunciated as the law of Alabama in *Meyerson v. New Idea Hosiery Co.,* 217 Ala. 153, 115 So. 94 (1927), as follows:

> The right of a third person for whose benefit a promise is made is affected with all of the infirmities of the agreement as between the parties thereto....

115 So. at 97.

*Meyerson* is cited for this proposition in 2 *Williston on Contracts,* § 364A (Jaeger Ed.1954), where Professor Williston's famous treatise explains the logical basis for it, although the logic is so obvious as to require no exegesis. The same proposition is also well expressed in *United States v. Industrial Crane & Manufacturing Co.,* 492 F.2d 772 (5th Cir.1974), a binding precedent from a case arising in Alabama, as follows:

> The United States' right against appellant was exclusively as a third party beneficiary. It stood in Billmeier's shoes, and any defenses that appellant could have raised against a claim by Billmeier himself were operative against it, too.

492 F.2d at 774.

### The Arbitration Non–Issue

Sensing the problems for plaintiffs under any method of interpreting this contract, and probably sensing the statute of limitations problem facing them if they must start all over again pursuing Mulvehill, plaintiffs ask this court to *order* arbitration. This alternative request has been discussed, *supra,* but one more thing needs to be said about it. Plaintiffs do not need, and therefore cannot seek, this court's assistance in forcing Mulvehill to arbitrate.

As strange as it may be that plaintiffs filed this action in the first place, it is stranger still that they have not formally moved for a dismissal without prejudice. If this court lacks jurisdiction, Mulvehill might need some court, somewhere, sometime, to determine that he is not an "employer" as a member of any "controlled group" and not a "seller of assets" and therefore was never and will never be a proper target for withdrawal liability under MPPAA. And, alternatively, Mulvehill might need a court ultimately to evaluate his statute of limitations defense and his "exhaustion of remedies" defense. But plaintiffs are certainly not entitled to invoke MPPAA yet. In fact, these very plaintiffs did very well against Van Mulvehill Coal Co., Inc. *without any arbitration.* Arbitration is the prerogative of the *employer* under MPPAA. It can be triggered only by the *employer.* Plaintiffs obtained an $85,275.83 judgment against the *employer* here. This was probably the maximum possible amount that could be guesstimated by plaintiffs. It happened without any arbitration proceeding whatsoever. Plaintiffs are trying to obtain arbitration by motion that they could not have sought in their original complaint. A plaintiff is not entitled to major relief not requested in his complaint or in an allowed amendment.

*Conclusion*

For the foregoing separate and several reasons, there is no way to conclude that plaintiffs have any viable avenue for success in this court. It is doubtful that they have an avenue for success in any other forum. Summary judgment will therefore be entered in favor of defendant Mulvehill. Plaintiffs' various motions will be denied.