**UNITED MINE WORKERS OF AMERICA 1950 BENEFIT PLAN AND TRUST, et al., Appellants,**

v.

**BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.**

No. 89–7179.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1990.
Decided Feb. 27, 1990.

---

Robert M. Weinberg, Washington, D.C., with whom David W. Allen, Baltimore, Md., Julia Penny Clark, Washington, D.C., were on the brief, for appellants.

Peter Buscemi, with whom Robert A. Dufek and Stanley F. Lechner, Washington, D.C., were on the brief, for appellee.

Before SILBERMAN, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellants, the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust" or "Trust"), challenge an order of the district court denying their motion for a preliminary injunction. The Trust sought the injunction to require appellee, the Bituminous Coal Operators' Association ("BCOA"), to exercise its authority to increase, pending final resolution of this case, the rate at which employers contribute to the Trust from $2.17 to $2.72 per hour worked by their employees. Because we believe that a critical element of the district court's decision on the Trust's motion was based on legal error, we remand for further proceedings consistent with our opinion.

## I.

Since 1950, the United Mine Workers of America and employers in the coal industry have provided health and retirement benefits to their industry's employees. The terms for the provision of these benefits are established by the UMWA and. the BCOA, an association representing multiple employer coal operators, in collective bargaining agreements, known as National Bituminous Coal Wage Agreements. The 1950 Agreement created the UMWA Welfare and Retirement Fund, which provided health and pension benefits to retired and disabled miners until 1974. In 1974, the 1950 Benefit Trust and the 1950 Pension Plan and Trust ("1950 Pension Trust") were created to provide benefits to miners who retired prior to December 31, 1975, miners who were disabled prior to December 6, 1974, and their dependents and survivors.

The appellant, the 1950 Benefit Trust, is funded solely out of employer contributions, the terms for which have been provided in all Agreements since 1974, including those of 1978, 1981, 1984 and 1988. The 1988 Agreement went into effect on February 1, 1988 and expires on January 31, 1993. All of the Agreements bind the BCOA as well as its individual members. But a number of non-BCOA companies in the coal industry have also agreed to be bound by the 1988 Agreement's terms and conditions by signing "me-too" contracts with the UMWA. And several coal companies, which have not signed the 1988 Agreement, signed prior Agreements. As signatories to the 1978, 1981 or 1984 Agreements, each of these companies agreed, in a contractual provision known as the "evergreen" clause, to continue making contributions to the 1950 Benefit Trust as long as a successor collective bargaining agreement requires such contributions. The evergreen clause requires these companies to contribute to the 1950 Benefit Trust at the rate established by successor Agreements.

Under the 1988 Agreement, employers agreed to a "guarantee clause" under which they would "[n]otwithstanding any other provisions in this Agreement ... fully guarantee the pension and health benefits provided by ... the 1950 Benefit Fund [Trust]" during the term of the Agreement. According to the contract, employers would contribute to the 1950 Benefit Trust amounts based on the number of hours of coal production work performed by their employees: $1.83 per hour worked from February 1, 1988 to January 31, 1989; $1.84 per hour worked from February 1, 1989 to January 31, 1990; and $1.85 per hour worked from February 1, 1990 until

the 1988 Agreement's expiration on January 31, 1993. Where, however, these rates would not fully fund the guaranteed benefits of the 1950 Benefit Trust, the 1988 Agreement provides for two mechanisms by which the BCOA could increase contributions to the 1950 Benefit Trust. First, the BCOA is authorized to decrease the rate of employer contributions to the 1950 Pension Trust and correspondingly increase the rate of employer contributions to the 1950 Benefit Trust. Second, the BCOA can increase the employer contribution rate to the 1950 Benefit Trust. The relevant language of this provision states, "[i]n order to fully fund these guaranteed benefits, the BCOA may increase, not decrease, the rate of contributions to be made to the ... 1950 Benefit Fund [Trust] ... during the term of this Agreement. These contributions, which may be adjusted from time to time, shall be made by all Employers signatory hereto during the term of this Agreement." See 1988 Agreement, art. XX, § (h). Currently, the 1950 Pension Trust is fully funded. Accordingly, the rate of employer contributions to the 1950 Pension Trust is zero so that the BCOA cannot reallocate employer contributions from the 1950 Pension Trust to the 1950 Benefit Trust.[1]

Faced with a shortfall in employer contribution income, the BCOA, in July 1988, raised the employer contribution rate to the 1950 Benefit Trust under the 1988 Agreement from $1.83 per hour to $2.00 per hour for the months of July through September 1988, and it subsequently extended that $2.00 per hour contribution rate to the months of October 1988 through April 1989. Thereafter, the BCOA ordered an increase in the contribution rate for the months of May through September 1989. Despite these increases, the financial state-ment of the 1950 Benefit Trust showed a deficit (the amount by which the Trust's total liabilities exceed total contribution income) of over $37,000,000.[2] The Trust then brought an action in district court alleging, *inter alia*, that the BCOA had breached its obligations under article XX, section (h) of the 1988 Agreement by refusing to establish an employer contribution rate sufficient to fully fund the Trust's guaranteed benefits.[3] The Trust moved for a preliminary injunction, asking the district court to order the BCOA to increase the employer contribution rate from $2.17 to $2.72 per hour pending resolution of the case. The BCOA filed an opposition to the Trust's motion for a preliminary injunction and also filed counterclaims against the Trust and its Trustees alleging various breaches of contract and fiduciary duties. The BCOA argued that the 1988 Agreement did not require the BCOA to set an employer contribution rate that would always fully fund the guaranteed benefits of the Trust, and that, even if such an obligation did exist, the BCOA was relieved of it on the ground that the Trustees had mismanaged the Trust.

At the outset of the hearing on the motion, the district judge expressed concern about the Trust's ability to show that it was likely to prevail on the merits of its claim. In an exchange with counsel for the Trust, the judge suggested that the language of the Agreement, stating that "the BCOA may increase, not decrease, the rate of contributions to be made to the ... 1950 Benefit Fund [Trust]," represented an unambiguous expression of the contracting parties' intent to give the BCOA complete discretion in deciding whether to increase the contribution rate. In support of its

---

1. The Coal Industry Health Benefit Stabilization Act of 1989, S. 1708, 101st Cong., 1st Sess., which was introduced in the Senate on September 29, 1989, would, *inter alia,* authorize the transfer of surplus assets from the 1950 Pension Plan to the 1950 Benefit Plan. The legislation would also impose, statutorily, a continuing contribution obligation on employers who were contributing to the Trust on January 1, 1988.

2. The parties differ over whether the 1950 Benefit Trust's financial condition is deteriorating or improving. The Trust maintains that its deficit is increasing. The BCOA argues that the Trust is now able to meet its current expenses, suggesting that the deficit is either improving or has stabilized.

3. The Trust brought its complaint under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, as a third party beneficiary of the 1988 Agreement.

interpretation that the Agreement places on the BCOA the duty to increase the employer contribution rate as necessary to ensure full funding of the Trust, counsel for the Trust introduced two memoranda for the file, dated March 1 and 12, 1978, written by BCOA representatives at the time that the BCOA first negotiated and signed the language of article XX, section (h) of the Agreement in 1978.[4] The judge, however, observed that, with respect to the memoranda, "you encounter the obstacle of the parol evidence rule with respect to that memorandum" and stated, "it would seem to me that you would be contemplating an effort to reform the instrument."

At the conclusion of the hearing, the district judge issued a brief oral opinion. He denied the application for a preliminary injunction on the ground that the Trust's counsel had not shown a likelihood of success on the merits of its claim. But he also expressed uncertainty over whether the Trust's counsel had shown a likelihood that it would be irreparably harmed absent the injunction, suggesting the adequacy of a legal remedy on the guarantee clause and stating that there were unresolved issues of fact with respect to the imminence of the lapse of benefits. Nevertheless, the judge ruled as he did because he thought there was a sufficient likelihood of irreparable harm to warrant the case's being disposed of by him as quickly as possible so that an appeal could be lodged. With regard to the two remaining factors which must be shown to warrant an injunction, public interest and harm to others, *see, e.g., Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958), the judge indicated at the start of the hearing that he sided with the Trust but did not make any findings after argument concerning these two factors. We expedited the Trust's appeal of the district court's denial of its motion for a preliminary injunction but denied the Trust's motion for an injunction pending appeal.

## II.

Since the district court based its denial of the preliminary injunction primarily on its view that the Trust was unlikely to prevail on the merits, appellants focus their challenge on appeal on that determination. That question by itself is a pure issue of law which we have said we review *de novo. See Air Line Pilots Ass'n v. Eastern Air Lines,* 863 F.2d 891, 894–95 (D.C.Cir.1988). The district court tentatively accepted the BCOA's arguments that the collective bargaining agreement by using the language, "the BCOA *may* increase, not decrease, the rate of contribution to be made to the ... 1950 Benefit Fund [Trust]," conferred unbridled discretion upon the BCOA to raise the contribution rate or not as it wished. In so doing, the court either refused to consider or thought insignificant the two memoranda to the file drafted by the BCOA negotiators contemporaneously with the initial negotiation of that contract language in 1978.

The first memorandum, dated March 1, 1978, states that the language of article XX, section (h) of the 1978 Agreement intended to ensure to miners that during its term "nothing would occur by which the benefit levels provided in the respective funds would fail to be paid." It goes on to say that "[i]n the event that the payments into [the 1950 Benefit Trust] were insufficient to pay those benefits ... the BCOA would increase the level of those payments sufficient to guarantee that the benefits would be paid." Finally, the memorandum points out that the language of article XX, section (h), "[i]n order to fully fund these guaranteed benefits, the BCOA may increase, not decrease, the rate of contributions to be made to the ... 1950 Benefit Trust," "is not intended to mean anything other than that the BCOA would increase the rate of contribution to provide adequate cash for the Trustees to provide the benefits." The second memorandum, dated March 12, 1978, represents its author's understanding of the language of the arti-

---

**4.** Article XX, section (h) was first adopted in the 1978 Agreement and has been carried forward *in haec verba* in all subsequent Agreements.

cle XX, section (h) to be "that the contribution rates would be adjusted, if necessary, by the BCOA, regardless of the reasons for failure of adequate monies in the Trusts to pay the pension and benefit levels."

These memoranda, of course, are supportive of the Trust's interpretation of the disputed clause, and we have said before that when interpreting collective bargaining agreements, extrinsic evidence of the meaning of disputed clauses such as past practice, related agreements, and bargaining history are quite properly considered to determine the parties' intentions, especially where the Agreement is ambiguous. *See Local Union 1395 v. NLRB*, 797 F.2d 1027, 1036 (D.C.Cir.1986). We therefore conclude the district court was in error in believing the memoranda's significance was eclipsed either partially or totally by the parol evidence rule.

Even without the memoranda, however, we think the BCOA's construction of the Agreement quite unlikely. The BCOA concedes that the collective bargaining agreement imposed on the signatory employers an absolute duty "to fully guarantee the pension and health benefits." The only machinery provided in the Agreement to effectuate that guarantee, however, is the authority placed in the employers' agent, the BCOA, to raise the contribution rate. If the BCOA were not compelled to raise the contribution rate for all employers as needed, the Trust would be obligated, in the event of a shortfall, to sue all employers individually, and there would be no apparent mechanism to impose the "tax" rate equally on signatory employers. It seems rather clear to us, then, that the word, "may," as used in the disputed clause does not confer absolute discretion on the BCOA to refuse to raise the contribution rate.

The Trust suggests that "may" rather than "shall" was used merely because the BCOA, when the clause was originally drafted, had another option besides raising the contribution rate available for use in meeting a shortfall in funding. The BCOA could have, at that time, diverted contributions from the 1950 Pension Trust to the 1950 Benefit Trust. That option was not available when the 1988 Agreement was signed, however, because the 1950 Pension Trust was then fully funded and therefore no longer receiving contributions. The language of the collective bargaining agreement, not atypically, was not changed despite that changed circumstance. We think that the Trust's explanation of the choice of the word, "may," is plausible. And in conjunction with the structure of the Agreement, the contemporaneous memoranda, and the implausible implications of the BCOA's interpretation, our conclusion makes the BCOA's interpretation of the Agreement—at least as to its claim of unbridled discretion—unlikely to prevail.[5]

The real difficulty in this case, it would appear, is that, as the BCOA contends, a number of employers are either paying a contribution rate below $2.17, or not paying at all. Some of these employers, it is alleged, have been given more favorable collective bargaining agreements by the Union. The BCOA claims that pursuant to the evergreen clause these employers are nevertheless obliged to pay the same contribution rate as that set by the BCOA and that the Trust has a contractual as well as a fiduciary obligation to force these employers to pay the $2.17 rate, in which case no increase of contributions for BCOA members would be necessary. The Trust responds that it is pursuing at least some of these employers (but not the Union) and that if the Trust is committing a fiduciary breach, it is no defense to its contract claim. Furthermore, the Trust argues that the failure of other employers to pay the full contribution rate, whether or not it can be thought to be the Trust's fault, does not excuse the BCOA's refusal to raise the contribution rate because the employers' obligation is unconditional, "[n]otwithstanding any other provisions in this Agreement."

We confess to a good deal of confusion concerning this aspect of the dispute. We

---

**5.** We do not know whether the BCOA wishes to put on evidence, such as bargaining history, seeking to rebut the memoranda or to otherwise interpret the Agreement.

do not have before us either the Union or a representative of those employers who are alleged not to be paying their contractually obligated (through the evergreen clause) full share. For reasons that elude us, they have not been brought into this action as third party defendants. Although we are inclined to agree with the Trust that any fiduciary breaches it may have committed inure to the beneficiaries of the Trust, and therefore are not a defense to third party beneficiary contract claims against the BCOA,[6] it may well be that the Trust has an implied obligation, as a matter of contract law, to deal equitably with all employers.[7] Indeed, if the BCOA's contractual obligation to raise the contribution rate, when needed, is in part implied because it is the only mechanism whereby the employers' unconditional obligation to fund the Trust can be discharged through a uniform contribution rate, it might be anomalous if that mechanism were used to impose arguably disparate contribution rates. To be sure, the Trust asserts that it is doing all that it can to collect against delinquent employers, but it is unclear how it regards those employers who are signatory to recent collective bargaining agreements providing concessionary rates.

We are, therefore, not confident that this issue has been adequately presented to the district court (or us). And furthermore, it is quite unclear whether or not the district court declined to grant the injunction on the alternative ground that the Trust might have an adequate remedy at law—which we take to be actually a question as to irreparable injury. The court noted that no beneficiary of the Trust has yet been refused treatment. The Trust asserts that this is so only because medical providers are offering service without prompt payment and if the fund is being depleted, irreparable injury would be established. That may be the case. *See Connors v. Shannopin Mining Co.*, 675 F.Supp. 986, 988–89 (W.D.Pa.1987); *Combs v. Hawk Contracting, Inc.*, 543 F.Supp. 825, 829–30 (W.D.Pa.1982). *But see Sheet Metal Workers' Int'l Ass'n v. West Coast Sheet Metal Co.*, 660 F.Supp. 1500, 1507 (S.D.Cal. 1987) (requiring a showing of specific irreparable harm stemming from a lapse in payments to union trust fund). But on remand, the district court should inquire promptly into both the irreparability of the injury and the confusing state of existing and expected contribution rates for all relevant employers; for even if the Trust is correct on all its legal and factual claims, the amount of any increase in the contribution rates for BCOA members presumably will, in part, depend on what other employers will contribute.

\* \* \* \* \* \*

Accordingly, the case is remanded to the district court for further proceedings consistent with this opinion.

---

6. The BCOA also alleges that (1) the Trust has improperly used contributions collected under the 1988 Agreement to pay for health care provider bills incurred under the 1984 Agreement; (2) the Trust refused to reallocate proceeds of settlements received by the 1950 Pension Trust and miscalculated its reallocation needs from the 1950 Pension Trust; and (3) the Trust has failed to obtain full and prompt reimbursements from Medicare. The BCOA is a limited fiduciary within the meaning of the Employment Retirement Income Security Act, 29 U.S.C. § 1002(21)(A). If the Trustees were engaging in breaches of fiduciary duty, *see* 29 U.S.C. §§ 1104(a)(1)(A) & (B), the BCOA is entitled to bring a civil enforcement action to recover money on behalf of the Trust under 29 U.S.C. § 1132(a)(2), which gives a Trust participant or beneficiary, a trust fiduciary, or the Department of Labor the statutory authority to do so.

7. In the absence of such an obligation a situation might arise in which the BCOA would be applying ever-increasing contribution rates to employers who contribute at the BCOA established rate in order to maintain benefits to employees of companies who make lower, nonconforming contributions to the Trust. On the other hand, if the 1988 Agreement does indeed embody an obligation of signatory employers to contribute to the Trust at uniform rates, then that obligation may run jointly and severally to the BCOA and to every other employer. The BCOA, its members, and any other contributing employers may in that case be entitled to bring enforcement actions against one another for breach of contract. *See Painting and Decorating Contractors Ass'n v. Painters and Decorators Joint Comm.*, 707 F.2d 1067 (9th Cir.1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984).