782 F.Supp. 658 (1992)
In re UNITED MINE WORKERS OF AMERICA EMPLOYEE BENEFIT PLANS LITIGATION.
UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST, et al., Plaintiffs,
v.
The PITTSTON COMPANY, et al., Defendants.
UNITED MINE WORKERS OF AMERICA 1950 BENEFIT PLAN AND TRUST, et al., Plaintiffs,
v.
PITTSBURG & MIDWAY COAL MINING CO., Defendant.
John Allen PIERCE, et al., Plaintiffs,
v.
UNITED MINE WORKERS OF AMERICA 1950 BENEFIT PLAN AND TRUST, et al., Defendants.
UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST, et al., Plaintiffs,
v.
RAWL SALES & PROCESSING CO., Defendant.
Multidistrict Litigation No. 886, Civ. A. Nos. 88-969, 88-3716, 89-2833 and 91-3241, Misc. No. 91-386.
United States District Court, District of Columbia.
January 31, 1992.
As Amended February 3, 1992.
*659 Julia Penny Clark, Washington, D.C., for the Trusts.
Thomas Gies, Crowell & Moring, Washington, D.C., for Pittsburg & Midway.
John Martin Wood, Reed Smith, Shaw & McClay, Washington, D.C., for Pittston.
John Mooney, Beins, Axelrod, Osborne & Mooney, Washington, D.C., for Pierce.
David H. Battaglia, Greg Robertson (Richmond Office), Hunton & Williams, Washington, D.C., for Rawls.
Stanley Lechner, Morgan, Lewis & Bockius, Washington, D.C., for BCOA.

MEMORANDUM OPINION
THOMAS F. HOGAN, District Judge.
Before the Court are cross-motions for summary judgment in Civil Action Nos. 88-969 (Pittston), 88-3716 (Pittsburg & Midway (P & M)), 89-2833 (Pierce), and Civil Action No. 91-3241 (Rawl).[1] The three *660 cases brought by the United Mine Workers of America (UMWA) Pension and Benefit Trusts (the Pittston, P & M, and Rawl cases) are actions to collect delinquent contributions and are brought pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. (ERISA) and § 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185(a) (LMRA).[2] The case brought by the UMWA and some of its individual members (the Pierce case) is an action for declaratory and injunctive relief to prevent the Trusts from interfering with the collective bargaining agreement entered into between the UMWA and Pittsburg & Midway Coal Mining Co. in 1988 (the 1988 UMWA/P & M Agreement). It is also brought pursuant to ERISA and LMRA. Similarly, in the Pittston case, Pittston has filed a counterclaim seeking a declaratory judgment that the collective bargaining agreement, entered into between the UMWA and all of the Pittston Coal Group Companies (collectively referred to as PCG) in 1990 (the 1990 UMWA/PCG Agreement) is a valid and enforceable agreement. Rawl has filed a similar counterclaim with respect to the collective bargaining agreements entered into between the UMWA and Sprouse Creek Processing Company, Inc., Rocky Hollow Coal Company, Inc., Big Bottom Coal Company, Inc., Tall Timber Coal Company, and P.M. Charles Coal Company (collectively referred to as the Rawl Companies) in 1984 (the 1984 UMWA/Rawl Agreements).[3] Having considered the cross motions and supporting memoranda and exhibits, the Court shall grant summary judgment for the Trusts in all four cases for the reasons that follow.

I. BACKGROUND: THE EVERGREEN CLAUSE
Although the causes of action in the four cases at issue are technically distinct, each involves the interpretation of the "evergreen clause" or "continuing contributions clause," which is found in the language of the UMWA 1950 Benefit Plan and Trust (the 1950 Benefit Trust), the UMWA 1950 Pension Trust (the 1950 Pension Trust), the UMWA 1974 Pension Trust (the 1974 Pension Trust), and the 1974 Benefit Plan and Trust (the 1974 Benefit Trust).[4] The terms of these Trusts were negotiated by the Bituminous Coal Operators' Association (BCOA) and the UMWA in 1978. According to the Trusts and the BCOA, who is acting as amicus curiae in these cases, the evergreen clause was intended to provide for the long-term financing of pensions and health benefits for elderly miners who retired from the coal industry.[5] Thus, allegedly *661 to ensure that the obligation to contribute would apply equally to all participating employers, the BCOA and the UMWA placed the evergreen clause into the trust documents, which are incorporated by reference into the collective bargaining agreements of every employer that elects to participate in the Trusts, including employers who are not members of the BCOA.
The language of the evergreen clause is the same in each Trust except that the name of the Trust is different in each one. For example, the evergreen clause as first written in the 1950 Benefit Trust provides:
Any employer who employed any Participant eligible for coverage under, or who receives or received benefits under, the 1950 Benefit Plan and Trust, or any Employer who was or is required to make, or who has made or makes contributions to the 1950 Benefit Plan and Trust, is obligated and required to comply with the terms and conditions of the 1950 Benefit Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1984.
1950 Benefit Trust, Article XII (emphasis added). The most recent National Bituminous Coal Wage Agreement (NBCWA) was entered into in 1988 and specifies the amounts to be contributed by employers participating in the 1950 and 1974 Trusts.
The thrust of the Trusts' claim is that the defendant employers obligated themselves to the continuing contributions required by the NBCWA when they either: (1) became signatories to one of the NBCWAs since 1978, which incorporated the Trusts by reference, or (2) entered into individual collective bargaining agreements with the UMWA that were "me-too" agreements patterned after the NBCWA and also incorporating the Trusts by reference. The Pittston and Rawl cases are an example of the former, while the P & M case is an example of the latter.[6]
In Pittston, the 1950 and 1974 Trusts were incorporated into the 1984 NBCWA, to which the PCG companies were signatories.[7] Article XX of this agreement covers health and retirement benefits and provides that:
The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The terms of the 1950 Fund have heretofore been amended by substituting the terms of the 1950 Pension Trust and of the United Mine Workers of America 1950 Pension Plan ("1950 Pension Plan"). The 1950 Pension Plan is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.
The United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1950 Benefit Trust provides health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1950 Benefit Trust.
1984 NBCWA, Article XX, Section (b) (emphasis added). Using similar language, the 1984 NBCWA incorporated the 1974 Trusts in Article XX, Section (c). Like the PCG Companies, the Rawl companies were signatories to an NBCWA that incorporated the 1950 and 1974 Trusts by reference. The last NBCWA that they were signatories to, however, was the 1981 NBCWA, *662 which expired in 1984.[8] It contained language identical to that in Article XX of the 1984 NBCWA.
In the P & M case, P & M, as a non-BCOA company, entered into a separate agreement with the UMWA known as the North River Energy Company Coal Wage Agreement of 1984 (1984 North River Agreement). That agreement contained language identical to the language quoted above from the 1984 NBCWA. It too incorporated the 1950 and 1974 Trusts and provided that the terms and conditions of those Trusts were as set forth in the Trusts themselves. See 1984 North River Agreement, Article XX, Sections (b) and (c).
The thrust of the defendant employers' arguments is that federal labor law and policy does not permit interference with the rights of employers and unions to negotiate collective bargaining agreements. Additionally, they argue that the Trusts are collaterally or judicially estopped from attempting to enforce the evergreen clause based on: (1) a recent district court decision in two related cases in this district and (2) the Trusts' apparent inconsistent position with respect to cases in which it has sought withdrawal liability from employers who are not contributing to the Trusts.

II. DISCUSSION: ARGUMENTS AND ANALYSIS
The issues raised in the cross motions for summary judgment fall into three basic categories: (1) the proper interpretation of the language of the Trusts and the collective bargaining agreements, (2) the applicability of federal labor policy, and (3) the applicability of collateral or judicial estoppel.

A. Language Interpretation

1. Plain Language
The defendant employers argue that the 1984 collective bargaining agreements (in the Pittston and P & M cases) and the 1981 agreement (in the Rawl case) specifically limited their obligations to contribute to the Trusts to the duration of those collective bargaining agreements. The 1981 and 1984 NBCWAs and the 1984 North River Agreement provided in a number of places that contributions were to be made "during the life of this Agreement." For instance, in the section covering contributions by employers, the agreements provided that "[d]uring the life of this Agreement, for the periods of time indicated below, each signatory Employer engaged in the production of coal shall contribute to the Trusts referred to in this Article the amounts specified below...." 1981 NBCWA, Article XX, Section (d); 1984 NBCWA, Article XX, Section (d); 1984 North River Agreement, Article XX, Section (d). Later, in what is known as the "guarantee clause," the agreements added more qualifying language:
Notwithstanding any other provisions in this Agreement the Employers hereby agree to fully guarantee the pension and health benefits provided by the 1950 Pension Fund, the 1950 Benefit Fund, the 1974 Pension Fund, the 1974 Benefit Fund and all other benefit plans described in Section (c) of this Article XX during the term of this Agreement.

In order to fully fund these guaranteed benefits, the BCOA may increase, not decrease, the rate of contributions to be made to the 1950 Pension Fund, the 1950 Benefit Fund, the 1974 Pension Fund, the 1974 Benefit Fund and all other benefit plans described in Section (c) of this Article XX during the term of this Agreement. These contributions, which may be adjusted from time to time, shall be made by all Employers signatory hereto during the term of this Agreement.

1981 NBCWA, Article XX, Section (h); 1984 NBCWA, Article XX, Section (h); 1984 North River Agreement, Article XX, Section (h). Pittston, P & M, and Rawl now argue that by the express terms of the 1981 and 1984 agreements, once those agreements expired, the defendants' obligations *663 to contribute to the Trusts also expired. In fact, as the defendants point out, the subsequent agreements entered into between the employers and the UMWA (the 1990 UMWA/PCG Agreement, the 1988 UMWA/P & M Agreement, and the 1988 UMWA/Rawl Agreements) specifically provide for the termination of the defendants' obligations to contribute to the 1950 Trusts. A Memorandum of Understanding between the PCG companies and the UMWA, which is incorporated into the 1990 UMWA/PCG Agreement, provides that:
... the PCG Companies shall be deemed to have withdrawn from the UMWA 1950 Pension Plan and Trust and the UMWA 1950 Benefit Plan and Trust ("the 1950 Plans") at 12:00 a.m. February 1, 1988. The PCG Companies shall not participate in the 1950 Plans nor shall they be bound by or subject to any term or provision of the documents which govern the existence or administration of the 1950 plans.
Memorandum of Understanding Concerning Participation in the United Mine Workers of America Health and Retirement Funds, ¶ 1 (February 21, 1990) (UMWA/PCG MOU).[9] The 1988 UMWA/P & M Agreement similarly provided for a termination of P & M's contribution obligations:
As of 11:59 p.m., January 31, 1988 (the "termination date"), the Employer shall totally and perma-nently [sic] cease to have any obligation to make contributions to the United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") or to the United Mine Workers of America 1950 Benefit Trust ("1950 Benefit Trust") (collectively the "1950 Trusts").
1988 UMWA/P & M Agreement, Article XX, Section (b).[10] Not surprisingly, the 1988 UMWA/Rawl Agreements followed suit, including a provision stating that "[t]his Agreement supersedes all existing and previous contracts except as incorporated and carried forward herein by reference. ..." 1988 UMWA/Rawl Agreements, Article XXIV, Section (b).
The Trusts argue that all of the limiting language contained in the 1981 and 1984 NBCWAs and the 1984 North River Agreement referred only to the rates of contribution to the Trusts rather than to the obligation to continue contributing to the Trusts. In other words, the Trusts argue that the provision providing that "during the life of this Agreement" each signatory employer must contribute certain specified amounts, means that those specified rates of contribution apply only during the life of the collective bargaining agreement. Upon the expiration of the agreement, the obligation does not cease, but the rates of contribution may change in accordance with the rates set out in the successor NBCWA. The same argument can be made with respect to the language of the guarantee clause contained in the 1981 and 1984 NBCWAs and the 1984 North River Agreement, quoted above.
In addition to their arguments based on the limiting language of the 1984 Agreements, the defendants have another argument based on the language of the evergreen clause itself. They argue that their 1988 and 1990 individual collective bargaining agreements with the UMWA are "successor agreements" within the meaning of the evergreen clause. The Court finds this argument unpersuasive.
The evergreen clause provides that employers who choose to participate in the Trusts become obligated to comply with the terms and conditions of the Trusts, "including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor *664 agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1984." (Emphasis added.) Notwithstanding defendants' arguments to the contrary, it is clear to the Court from the language of the evergreen clause that the word "thereto" specifically refers to the National Bituminous Coal Wage Agreement of 1978. The only successor agreements to that agreement are the National Bituminous Coal Wage Agreements of 1984, 1988, and subsequent years.
Although the Court finds no ambiguity in the meaning of "successor agreements thereto," the Court is less certain about the proper interpretation of the remaining language of the evergreen clause and the 1981 and 1984 collective bargaining agreements. Because this language is "`reasonably susceptible of different constructions or interpretations,'" Lee v. Flintkote Co., 593 F.2d 1275, 1282 (D.C.Cir.1979) (citation omitted), the Court will consider extrinsic evidence to determine the intent of the contracting parties.[11] This circuit made this exception to the parol evidence rule clear with respect to collective bargaining agreements, stating that:
when interpreting collective bargaining agreements, extrinsic evidence of the meaning of disputed clauses such as past practice, related agreements, and bargaining history are quite properly considered to determine the parties' intentions, especially where the Agreement is ambiguous.
United Mine Workers of America 1950 Benefit Plan and Trust v. Bituminous Coal Operators' Ass'n, 898 F.2d 177, 180-81 (D.C.Cir.1990).[12]

2. Extrinsic Evidence
Before the Court can consider extrinsic evidence, it must determine what extrinsic evidence is relevant to this case. P & M argues that only the intent of P & M and the UMWA when they negotiated the 1984 North River Agreement is relevant. The Trusts, however, argue that the intent of the BCOA and the UMWA in negotiating the terms of the Trusts and the 1984 NBCWA are relevant because the 1984 North River Agreement was merely a "me-too" agreement.[13] This Circuit has held that the intent relevant to interpreting a me-too contract "is that of the leader ..., not that of the follower." Bituminous Coal Operators' Ass'n, Inc. v. Connors, 867 F.2d 625, 635 (D.C.Cir.1989).[14] Accordingly, *665 the Court will look to evidence of the intent of the BCOA and the UMWA when negotiating the Trusts and the 1984 NBCWA.[15]
The Trusts' evidence of the intent of the evergreen clause is voluminous and persuasive. The Trusts have submitted the declarations of five people who took part in the negotiations between the BCOA and the UMWA in 1978, four of which are former BCOA negotiators and one of which is a former UMWA negotiator (who is now a trustee). Allegedly, it was as a result of these negotiations that the evergreen clause was added to the 1950 and 1974 Trusts. The declarations establish that the evergreen clause was written to ensure that all employers participating in the Trusts would share equally in the burden of amortizing the existing Trust deficits and in funding future benefits. In 1978, when the language was negotiated, the 1950 funds had about $6 billion in unfunded liabilities. The BCOA was allegedly concerned that without an obligation to continue contributing to the Trusts, some employers would try to terminate or reduce their contributions, thus leaving other employers to carry more than their share of the Trusts' liabilities. Roger M. Haynes, who was the chairman of the BCOA subcommittee on benefits for the 1978 negotiations (as well as for the 1971, 1974, 1981, and 1984 negotiations), states in his declaration as follows:
The evergreen clause was not a "technical" provision to assist the Funds in collecting delinquent contributions, and was not discussed in those terms. It was an important provision negotiated to make sure that any coal operator that voluntarily agreed to participate in the Funds in 1978 could not simply walk away from the Funds and leave its retirees behind, or negotiate cut-rate contributions with the UMWA, at the expense of the remaining employers....
. . . . .
These provisions were placed in the trust documents so that we could be sure that the trust documents would apply to any non-BCOA employer that wanted to participate in the Funds, even if that employer was not signatory to the NBCWA. In other words, an employer did not have to be a BCOA member or even signatory to a wrap-around contract to participate in the Funds. Non-BCOA employers were free to negotiate with the UMWA any terms and conditions of employment that they could negotiate. But once an employer agreed with the UMWA to participate in the Funds by using the Funds to provide benefits to its employees and retirees, that employer had to participate on the same terms as all other participating employers. Each employer had to contribute to the Funds at the same rate, and each would receive the same level of benefits for its employees and retirees. By insisting on these contractual preconditions for participation in the Funds in 1978 and thereafter, the Funds' settlors, BCOA and the UMWA, agreed that the Funds should not become a "last man's *666 club" where certain employers could pull out entirely, or contribute at reduced rates, at the expense of the remaining employers.
Second Declaration of Roger M. Haynes at ¶¶ 19 and 21 (Second Haynes Declaration). Mr. Haynes' statements are illustrative of the declarations of the other former BCOA negotiators. Each recounts the negotiation of the evergreen clause as an attempt to ensure that the Trusts would not become a "last man's club." Additionally, transcribed notes and minutes of the 1977-78 negotiations support the declarations and the Trusts' position that the BCOA was concerned about preventing employers from pulling out of the Trusts and leaving the remaining employers to foot the bill for retirees of those employers who had pulled out or had gone out of the coal-mining business.[16] During the 1979 congressional hearings on the Multiemployer Pension Plan Amendments Act of 1980 (which amended ERISA), Donald Pierce, who had participated in the 1978 negotiations on behalf of the UMWA, testified as follows:
We think it is imperative that existing, participating employers in multiemployer plans be kept in the fold. In the last negotiations, the Mine Workers and the operators added the following parallel language to each of the plans in trust, and that language, which I shall not quote [the evergreen clause language], essentially obligated all present employers who were contributing to the multiemployer plans, to continue contributing into the future based on contributions called for in successor agreements to the National Bituminous Coal Wage Agreement, whether or not that particular employer remained signatory to the Wage Agreement.
By attempting to insure that as many employers as possible remained, the union, of course, was helping to guarantee that an ever-increasing liability would not be added to employers who might remain, had other employers abandoned the plan.
Declaration of Donald E. Pierce, Jr. (Pierce Declaration), Exhibit A. Without detailing the numerous other examples provided as exhibits to the Trusts' cross motions, suffice to say that the Trusts have made an extremely persuasive showing regarding the intent of the evergreen clause.
The defendant employers, on the other hand, have submitted virtually no evidence to rebut the Trusts' showing of intent.[17] Instead, they rely on the argument that the Court need not consider extrinsic evidence or, in the alternative, that the intent of the BCOA and the UMWA is irrelevant. Additionally, they argue that the Trusts made up their current theory in 1986 (Rawl argues it was not created until 1988), after employers began entering into collective bargaining agreements that did not conform to the obligations allegedly required by the evergreen clause. To support this argument, P & M and Rawl point to a November 1986 decision of the Board of Trustees of the UMWA Health and Retirement Funds, in which the Board ruled that, with respect to "nonconforming" agreements:
(a) While the Union and an employer are obviously free in their collective bargaining to choose whatever plan of benefits coverage they may agree upon, if they agree that the employer is to contribute to any one of the Plans established under the National Bituminous Coal Wage Agreement, then the employer must contribute to such Plan on the basis of the *667 contribution rate established under that Agreement, and on no other rate.
(b) Appropriate remedial measures shall be taken by the Funds to ensure that participation in the National Agreement Plans is in accordance with the foregoing standard.
407th Meeting of the Board of Trustees of the United Mine Workers of America Health and Retirement Funds, November 24, 1986, at 3. Nothing that has been proffered to the Court suggests that the Board's decision was anything other than a policy statement about how to respond to nonconforming agreements in light of the history and intent of the evergreen clause. There is no evidence that this decision was the creation of some novel new theory upon which the Trusts could subsequently base their litigation.
The only statement that defendants have pointed to that arguably supports their position is an alleged statement by Donald Pierce, made at a Trustees' meeting in 1988. The statement was made during a discussion of a motion, proposed by Pierce, to accept participation in the Trusts by a certain employer on terms that apparently did not conform to the terms in the NBCWA.[18] The motion was opposed by other trustees, who recounted the history of the evergreen clause at length. The meeting minutes then indicate the following:
Trustee Pierce noted that the companies here had not signed the 1984 Wage Agreement, and that the Trustees have not taken the position that the UMWA and an employer cannot alter the employer's obligation under the "evergreen" provisions of the Plan documents. That situation is not present in the Pittston, A & E and related litigation, and such a conclusion may be unsupportable as a matter of labor law.
426th Meeting of the Board of Trustees of the United Mine Workers of America Health and Retirement Funds, June 7, 1988, at 4. The Trusts explain Pierce's first statement as an argument that with respect to new signatories, any level of contribution was better than no contribution at all. This argument was rejected by the other trustees. Pierce's second statement, referring to the Pittston litigation, was also rejected by the other trustees who now seek to enforce the evergreen clause.
The Court confesses to a great deal of confusion over the import of Pierce's statement. Certainly, to the extent that Pierce was advocating a position contrary to that now taken by the Trusts, it is clear that the position was rejected by the other trustees and as such should not have any effect on the merits of the cases now before the Court. Whether Pierce's statement is any indication of his recollection of the intent of the evergreen clause is, however, a more difficult question. The Court is nevertheless persuaded by Pierce's subsequent declaration that the evergreen clause was intended to prevent participating employers from withdrawing from the Trusts and leaving the liabilities to the remaining employers. This declaration is consistent with all of the other evidence of intent produced by the Trusts and is consistent with Pierce's own testimony at congressional hearings held in 1979.
Having reviewed the voluminous evidence of the negotiating history of the evergreen clause, the Court is convinced that the clause was intended to ensure that all participating employers would contribute equally to the Trusts and would not be permitted to withdraw from participation and leave the burden for funding the pensions and health benefits of retired miners to the remaining participating employers. By so holding that this is the proper interpretation of the evergreen clause, two issues remain: (1) is the obligation created by the evergreen clause permissible under federal labor law; and (2) are the Trusts collaterally or judicially estopped from taking their current position with respect to the evergreen clause?

*668 B. Federal Labor Policy

Although the parties argue strenuously over federal labor policy, all are in agreement about most of the fundamental precepts. All agree that collective bargaining obligations are determined by contract and that parties to collective bargaining are free to negotiate the terms of their agreement. P & M even agrees that parties can create obligations that survive the expiration of a collective bargaining agreement. The basis for such a continuing obligation "must necessarily find its genesis in the collective bargaining agreement." UAW v. Yard-Man, Inc., 716 F.2d 1476, 1479-83 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). See also Nolde Bros. Inc. v. Local No. 358, Bakery & Conf. Workers Union, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). Having agreed to this much, P & M asserts that only when the collective bargaining agreement clearly expresses the parties' intent to create a long-term obligation will a court enforce such an obligation. It then argues that the 1984 North River Agreement does not clearly express such an intent and, in fact, expresses an opposite intent by virtue of the limiting language discussed at length above.
The argument made by Pittston and Rawl, though stated in different terms, is basically the same. As a premise, they, like P & M, argue that the PCG companies and the Rawl companies have a statutory right to bargain with the UMWA over pension and benefits issues. This right has never been disputed. Pittston and Rawl then admit that they may waive their statutory rights, but argue that a court will not find a waiver unless it is "clear and unmistakable." Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708 & n. 12, 103 S.Ct. 1467, 1477 & n. 12, 75 L.Ed.2d 387 (1983); Southwestern Steel & Supply, Inc. v. NLRB, 806 F.2d 1111, 1114-15 (D.C.Cir. 1986). Next, just as P & M argued that its 1984 North River Agreement did not clearly express the intent to create a continuing obligation, Rawl and Pittston argue that neither the 1981 or the 1984 NBCWA constituted a "clear and unmistakable" waiver of their right to renegotiate contributions to the Trusts in the future.
Having made these arguments, the defendants seek this Court's declaration that the subsequent collective bargaining agreements entered into between the employers and the UMWA (the 1988 UMWA/P & M Agreement, the 1988 UMWA/Rawl Agreement, and the 1990 UMWA/PCG Agreement), are valid and enforceable and may not be collaterally attacked by the Trusts. Defendants' arguments, however, merely beg the question of how to interpret the evergreen clause. The 1988 and 1990 agreements can only be valid if the Court determines the evergreen clause does not create a continuing obligation. As the Court has already held, the negotiating history of the evergreen clause evidences a clear intent to create a continuing obligation.[19] Thus, the Court cannot issue the declaration that the defendants request unless it determines that the evergreen clause *669 is invalid or unenforceable for other reasons.
Defendants pose only one other argument to attack the validity of the evergreen clause. They argue that the clause as interpreted by the Trusts creates an indefinite or perpetual obligation that is unenforceable by the courts. It is true that "[l]abor contracts of indeterminate duration or ones that do not provide a manner of termination are terminable at will." Montgomery Mailers' Union 127 v. Advertiser Co., 827 F.2d 709, 715 (11th Cir.1987) (citing Communications Workers of America v. Southwestern Bell Telephone Co., 713 F.2d 1118, 1123 n. 4 (5th Cir.1983); Boeing Airplane Co. v. N.L.R.B., 174 F.2d 988, 991 (D.C.Cir.1949)). Thus, the defendants argue that they were free to terminate their obligation to contribute to the Trusts when their 1981 and 1984 collective bargaining agreements with the UMWA expired in 1984 and 1988, respectively.
The Trusts make several rebuttal arguments. First, they note that the issue in this case involves a single provision of a contract, not an entire labor contract. P & M has already agreed that a provision of a contract may survive the termination of the contract as long as such an intent is clearly expressed in the contract. Secondly, the Trusts argue that the evergreen clause is not indefinite or perpetual. Rather, the obligation to contribute continues only as long as the BCOA and the UMWA set new contribution rates in the NBCWA. Because the obligation is thus terminable upon the occurrence of a specific event, i.e., the BCOA and the UMWA agreeing not to set new contribution rates, the Trusts argue that it is not terminable at the will of the defendant employers and the Union. First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1012 (7th Cir.1985); Payroll Express Corp. v. Aetna Casualty & Surety Co., 659 F.2d 285, 291-92 (2d Cir.1981). Moreover, the Trusts note that it is common for courts to enforce contractual obligations to finance the pensions and benefits of retired employees even after the expiration of the contract providing for such benefits. See, e.g., United Steelworkers of America v. Connors Steel, 855 F.2d 1499, 1504-05 (11th Cir.1988) (when contract provided that pensioners "shall not have such coverage terminated or reduced ... so long as the individual remains retired from the company ...," court held that employer's obligation to provide benefits continued after the expiration of the negotiated labor contract); International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Its Local 784 v. Cadillac Malleable Iron Co., Inc., 728 F.2d 807, 808-09 (6th Cir.1984) (even when contract did not expressly state that retirees' benefits shall not be terminated or reduced, court held that it was intention of the parties that retirement benefits be made payable for the life of the retired employees, even after the expiration of the contract).
Finally, the Trusts argue that the basic proposition that contracts of indefinite duration are terminable at will is a rule of contract interpretation that can be overcome by evidence of contrary intent. The Trusts cite Hodge v. Evans Financial Corp., 707 F.2d 1566 (D.C.Cir.1983), in which this circuit, in the employment contract context, wrote that "[t]hough the classic assumption of the law is that the parties intend a contract of indefinite term to be terminable at will, basic principles of contract law inform us that the parties can contract otherwise. The controlling factor is the intent of the parties with respect to the terms of the contract...." Id. at 1568. With this rule of law as a background, once again the issue comes back to what the parties intended the evergreen clause to mean.
In support of their interpretation of the evergreen clause, the Trusts argue that national labor policy strongly favors the enforcement of contractual promises to contribute to multiemployer benefit funds. The Trusts cite some of the legislative debate over the Multiemployer Pension Plan Amendments Act of 1980, which added section 515 to ERISA, 29 U.S.C. § 1145. During this debate, Representative Thompson and Senator Williams stated that "[s]ound national pension policy demands that employers *670 who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises." 126 Cong.Rec. 23039 (1980) (remarks of Rep. Thompson); id. at 23288 (remarks of Sen. Williams).
Similarly, the Trusts cite cases such as those already cited in this Opinion, in which courts have held that retirement rights may not be altered merely by negotiating a new agreement, absent the consent of the pensioners. See Chemical Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181-82, 92 S.Ct. 383, 398-99, 30 L.Ed.2d 341 (1971). They also cite a litany of cases in which courts have noted the danger posed by unions entering into arrangements with particular employers that "might compromise the broader interests of the plan as a whole," Central States v. Central Transport, Inc., 472 U.S. 559, 579, 105 S.Ct. 2833, 2844, 86 L.Ed.2d 447 (1985), and have reiterated that each union and employer participating in a plan "has an interest in the prompt collection of the proper contribution from each employer." Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364, 373, 104 S.Ct. 1844, 1850, 80 L.Ed.2d 366 (1984). In short, the Trusts make the argument that goes to the heart of their case: without the Court's enforcement of the evergreen clause, the defendant employers and the UMWA will be permitted to compromise the broader interests of the 1950 and 1974 Trusts and adversely effect other participating employers who continue to make the required contributions.
The Court finds the Trusts' arguments persuasive. Without disputing any of the fundamental labor policies advocated by the defendants, the Court is convinced that the BCOA and the UMWA intended to create a continuing obligation to contribute to the Trusts once an employer makes the decision to participate. There is no evidence that the defendant employers were not aware of this obligation when they made the decision to participate in the Trusts. In light of this, it would run afoul of national labor policy for this Court to dishonor the parties' intentions and invalidate the evergreen clause as an unenforceable provision of indefinite duration. Therefore, the Court holds that the evergreen clause is neither invalid nor unenforceable based on federal labor policy.

C. Collateral and/or Judicial Estoppel

The defendants' final and perhaps most persuasive arguments in support of their motions for summary judgment involve collateral estoppel and judicial estoppel.

1. Collateral Estoppel
The doctrine of collateral estoppel, also referred to as issue preclusion, provides that "`once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" McLaughlin v. Bradlee, 803 F.2d 1197, 1201 (D.C.Cir.1986) (quoting Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980)). Although mutuality is no longer a requirement of collateral estoppel, Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (D.C.1979), the doctrine does have some strict requirements. First, the issue "must have been actually litigated, that is, contested by the parties and submitted for determination by the court." Otherson v. Dept. of Justice, 711 F.2d 267, 273 (D.C.Cir.1983). Second, the issue "must have been `actually and necessarily determined by a court of competent jurisdiction.'" Id. (quoting Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)). Third, preclusion "must not work an unfairness" because "the party to be bound lacked an incentive to litigate in the first trial, especially in comparison to the stakes of the second trial." Id. The potential for unfairness is especially acute when a party in the second case was not a party to the first case.
The defendant employers argue that the Trusts are collaterally estopped from litigating the evergreen clause based on two grounds: (1) the recent district court decision in the consolidated cases of Connors v. Island Creek Corp., et al., No. 87-1212, *671 and Connors v. Drummond Coal Co., et al., No. 87-1973 (D.D.C. Jan. 17, 1991) (Harris, J.) (collectively referred to as the Island Creek cases); and (2) the Trusts' apparent inconsistent position taken with respect to earlier cases in which they sought withdrawal liability.

a. The Island Creek Cases
In the Island Creek cases, even the Trusts admit that the evergreen clause and its enforceability were put into issue. The cases were brought by the 1950 Pension Trust to force the defendants, who were signatories to the 1984 NBCWA, to contribute to the Trust at the rate provided in that agreement, $1.11 per ton. Apparently, during the term of the 1984 NBCWA, the 1950 Pension Trust had become fully funded. The defendant employers and the UMWA then entered into Employment and Economic Security Pacts (EESPs) that reduced the contribution rate from $1.11 per ton to $0.25 per ton. The 1950 Pension Trust argued that the evergreen clause prevented the defendants from negotiating contribution rates that differed from those in the NBCWA.
The difficulty in analyzing the preclusive effect of Judge Harris' decision in the Island Creek cases is that although he granted summary judgment for the defendants, he issued no written opinion.[20] His brief two-paragraph Order merely states that "[o]n the facts and circumstances presented in these cases, the Court concludes that summary judgment in favor of the defendants is appropriate." Connors v. Island Creek Corp., et al., No. 87-1212 and Connors v. Drummond Coal Co., et al., No. 87-1973 (D.D.C. Jan. 17, 1991). The defendants argue that the validity of the evergreen clause was necessarily determined by this decision and that Judge Harris' holding is implicit: employers who have participated in the 1950 Pension Trust may negotiate separate agreements with the UMWA that modify their obligations in a way that is inconsistent with the NBCWA.
The Trusts have several rebuttals to this argument. First, they argue that although the meaning of the evergreen clause was put in issue in the Island Creek cases, it was not "actually determined" by Judge Harris. This is because the defendants in the Island Creek cases allegedly relied heavily on the fact that the 1950 Pension Trust was fully funded and the reduced contributions would have no effect on the actuarial soundness of the Trust. The Trusts cite several examples from oral argument in which counsel for the defendants stressed the importance of this fact. At one point counsel noted that this fact "distinguishe[d] this case from all of the other cases." Transcript of Oral Argument in Island Creek cases at 7 (Jan. 7, 1991). Counsel and Judge Harris both noted that this factual difference, among others, was the reason that the Island Creek cases were not consolidated with the cases now before this Court. Counsel repeatedly reiterated that the EESPs were to take effect "only after full funding had occurred and there could be no actuarial harm to the 1950 Pension Fund." Id. at 11. Judge Harris also reiterated the point, asking counsel whether full funding was in fact achieved before the lower contribution rate came into effect. Id. Based on these repeated references to the 1950 Pension Trust's full funding status, the Trusts suggest that the only issue actually determined by Judge Harris was that the employers and the UMWA are free to negotiate a reduced contribution rate to a fully funded trust.
The defendants' main rebuttal to this argument is that this circuit has already held that signatories to the 1984 NBCWA or a "me-too" agreement, which, by their terms, required employers to make contributions at a certain level, must continue to make the specified contributions without regard to the funding level of the Trust. Bituminous Coal Operators' Ass'n v. Connors, 867 F.2d 625 (D.C.Cir.1989). Thus, the defendants argue that Judge Harris could not have been relying on the funding level of the 1950 Pension Trust when he granted summary judgment for the defendants in the Island Creek cases.
*672 This Court need not speculate about the basis of Judge Harris' decision. This circuit has recently held, in no uncertain terms, that "if the basis of [a prior] decision is unclear, and it is thus uncertain whether the issue was actually and necessarily decided in that litigation, then relitigation of the issue is not precluded" by collateral estoppel. Connors v. Tanoma Mining Co., Inc., et al., 953 F.2d 682, 684 (D.C.Cir.1992). Because there was no written decision issued in the Island Creek cases, the basis for that decision is indisputably unclear. Therefore, this Court cannot hold that the validity of the evergreen clause was "actually and necessarily decided" in those cases and collateral estoppel will not operate to bar the litigation of the issue in the cases now before the Court.

b. The Withdrawal Liability Cases
The defendants point to four cases in which the Trusts brought claims for withdrawal liability under ERISA after the defendant coal companies ceased contributing to the Trusts upon the expiration of their collective bargaining agreements. To seek withdrawal liability under ERISA, an employer must have made a complete or partial withdrawal from a multiemployer pension or benefit plan. 29 U.S.C. § 1381(a). A partial withdrawal occurs when an employer's contributions drop below a certain level. Id. at § 1385. A complete withdrawal occurs when the employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." Id. at § 1383(a). In the cases referred to by defendants, the defendant employers were signatories to the 1978 NBCWA. When that Agreement expired in 1981, the defendants ceased contributing to the Trusts yet continued coal mining operations. The Trusts then brought their claims for withdrawal liability by alleging that when the 1978 NBCWA expired in 1981, the employers ceased having an obligation to the Trusts and thus completely withdrew from the Trusts within the meaning of 29 U.S.C. § 1383(a). This position, the defendants allege, is directly contrary to the position the Trusts take in this case.
The defendants' argument is compelling. In Combs v. Pelbro Fuel, Inc., No. 83-1524 (D.D.C. filed May 27, 1983), the Trusts' Proposed Findings of Fact and Conclusions of Law stated the following:
Pelbro "permanently cease[d] to have an obligation to contribute" to the Plans, as meant by Section 4203(a)(1) of ERISA, on March 27, 1981, when the 1978 Wage Agreement expired. Pelbro obviously ceased to have an obligation to contribute under a "collective bargaining (or related) agreement" on that date, as meant by Section 4212(1) of ERISA, 29 U.S.C. § 1392(1). Further, because the 1978 Wage Agreement in terms limited a signatory employer's obligation to contribute to "the life of this Agreement" and for "periods of time ... ending when this Agreement is terminated," Pelbro also ceased to have an obligation to contribute under "applicable labor-management relations law" on that date, as meant by Section 4212(2) of ERISA.
Plaintiffs' Proposed Findings of Fact and Conclusions of Law, No. 83-1524 at ¶ 4 (July 1984). The Trusts took a similar position in Connors v. B & W Coal Co., 646 F.Supp. 164 (D.D.C.1986) and in Connors v. Van Mulvehill, 679 F.Supp. 1071 (N.D.Ala. 1988). Additionally, in Garland Coal Co., 7 Employee Benefits Cas. (BNA) 1771, 1772-73 (1986), the Trusts argued in an arbitration proceeding that an employer had withdrawn from the Trusts when its collective bargaining agreement expired rather than at a later date urged by the defendant employer. In each of these cases, the employers discontinued contributing to the Trusts when the 1978 NBCWA expired in 1981. Thus, these cases represent an earlier group of cases than those now before the Court, which involve employers who ceased contributing after their 1981 and 1984 collective bargaining agreements expired.
The Trusts argue that the evergreen clause was not actually litigated and determined in any of these cases, therefore collateral estoppel does not apply. This is *673 indisputably true with respect to the Pelbro, B & W Coal, and Van Mulvehill cases, in which the Trusts alleged in their complaints that the defendant employers had ceased having an obligation to contribute to the Trusts. This is also true with respect to the Garland Coal case, in which the dispute was over the date of the employer's withdrawal from the Trusts. In none of these cases was the evergreen clause ever discussed or disputed. It simply was not mentioned. Accordingly, none of the elements of collateral estoppel have been met. Under this circuit's recent decision in Tanoma Mining, this Court holds that the Trusts are not collaterally estopped from litigating the evergreen clause based upon the allegedly contrary position taken in four earlier withdrawal liability cases.

2. Judicial Estoppel
Judicial estoppel "`precludes a party from taking a position inconsistent with one previously taken with respect to the same facts in an earlier litigation.'" Donovan v. United States Postal Service, 530 F.Supp. 894, 902 (D.D.C.1981) (quoting Himel v. Continental Ill. Nat'l Bank, 596 F.2d 205, 210-11 (7th Cir.1979)). The object of the doctrine of judicial estoppel "`is to safeguard the administration of justice by placing a restraint upon the tendency to reckless and false swearing and thereby preserve the public confidence in the purity and efficiency of judicial proceedings.'" Konstantinidis v. Chen, 626 F.2d 933, 937 (D.C.Cir.1980) (quoting Melton v. Anderson, 32 Tenn.App. 335, 339, 222 S.W.2d 666 (1948)). Unlike equitable estoppel, it does not require proof of privity, reliance, or prejudice. Id. Instead, it is invoked "to prevent a party from playing `fast and loose with the courts.'" Id. (quoting Scarano v. Central Railroad, 203 F.2d 510, 513 (3d Cir.1953)). Without ever expressly rejecting the doctrine, this circuit has expressed its wariness of judicial estoppel, agreeing with the Tenth Circuit that its utilization "`would be out of harmony with [the modern rules of pleading] and would discourage the determination of cases on the basis of the true facts as they might be established ultimately.'" Id. at 938 (quoting Parkinson v. California Co., 233 F.2d 432, 438 (10th Cir.1956)). See also American Methyl Corp. v. E.P.A., 749 F.2d 826, 833 n. 44 (D.C.Cir.1984).
Assuming that the doctrine is still viable in this circuit, the criteria for its application were spelled out in Donovan: "(1) the same facts must be in issue ..., (2) the judicial body must have `been led astray,' ... and 3) the assertions must not have been based on fraud, inadvertence, or mistake. ..." 530 F.Supp. at 902 (citing Konstantinidis, 626 F.2d at 937 & 939). Stated a bit differently, this circuit has held that the doctrine applies only to "cases in which a party prevails on a claim in one court and proceeds in a calculated manner to manipulate a second court by asserting facts at odds with those advanced before the first court." American Methyl, 749 F.2d at 833 n. 44.
The Trusts argue that the same facts are not in issue in the present cases as were in issue in the withdrawal liability cases because the evergreen clause was not at issue in those cases. Additionally, they argue that they have not deliberately manipulated the judicial process to their advantage. Instead, they point out that the few cases in which they sought withdrawal liability were brought in the early 1980s against relatively small employers. These cases were but a small fraction of the many cases regularly brought by the Trusts for withdrawal liability after coal companies cease operations. Later, as more and more larger employers such as the defendants in these cases began to cease contributing while remaining in business, the trustees engaged in a full analysis of the problem and determined that the evergreen clause imposed an obligation on employers that survived beyond the termination of their collective bargaining agreements. Ever since, the Trusts have conformed all of their practices to this interpretation and have not sought withdrawal liability in any case in which the evergreen clause is involved.[21] Although there is no *674 doubt an inconsistency in the positions taken by the Trusts over the years, the Court simply does not have before it any evidence of calculated manipulation of the courts or bad faith. For these reasons, as well as the general preference against the doctrine, the Court will not bar this litigation on the basis of judicial estoppel. The Court may, however, consider the Trusts' inconsistent positions as a judicial admission.

3. Judicial Admissions
Although a judicial admission is binding only in the case in which it was made, a court may consider a judicial admission as evidence in another case. See Universal American Barge Corp. v. J-Chem, Inc., et al., 946 F.2d 1131 (5th Cir. 1991); State Farm Mutual Auto Ins. Co. v. Worthington, 405 F.2d 683 (8th Cir. 1968). Such evidence may, however, be contradicted by other evidence when presented. Id.
In this case, the Court takes notice of the fact that, despite the reams of negotiating history supporting the Trusts' interpretation of the evergreen clause, the Trusts failed to rely on the clause a mere four years after it was negotiated when they moved for withdrawal liability in the Pelbro, B & W Coal, Van Mulvehill, and Garland Coal cases. One certainly would have thought that as important as the clause allegedly is, the Trusts would have brought suit to enforce the clause rather than to collect withdrawal liability. Their early decisions to seek withdrawal liability, and in doing so to assert that the noncontributing employers had ceased having an obligation to the Trusts, is in direct conflict with their current position that the expiration of a collective bargaining agreement does not result in the expiration of the obligation to contribute. The Court is greatly troubled by this apparent change of position.
As the Court has already discussed, the Trusts' basic excuse for this action is mistake or inadvertence. The Trusts' assert that there was never an occasion to consider bringing suit based on the evergreen clause until the large employers such as Pittston and P & M ceased contributing. At that point, the evidence is clear that the Trustees made a policy decision to begin enforcing the evergreen clause. There is no evidence that the trustees ever realized that they had previously brought actions for withdrawal liability when they should have brought them under the evergreen clause. This, the Court can only speculate, may have been the result of a lack of communication between the attorneys filling the complaints and the trustees themselves.
Although the Court considers the Trusts' contradictory positions to be some evidence that the evergreen clause was not intended to create the continuing obligation that the Trusts now seek to enforce, this evidence is greatly outweighed by the other evidence before the Court. As has already been detailed, the declarations of five of the negotiators of the evergreen clause establish that the evergreen clause was specifically created to prevent participating employers from withdrawing from the Trusts and leaving the burden of funding retiree benefits to the remaining participating employers. This intent is also clear in the transcripts of testimony before Congress in 1979. Moreover, the Court notes, the interpretation urged by the Trusts makes sense. No employer would want to be left paying for the benefits for retirees of other employers who decided to skip out on their obligations. The evergreen clause, as onerous as it may now appear, was a sensible way to ensure that no single employer or small group of employers would be left holding the bag. To fail to accept the Trusts' interpretation of the evergreen clause would produce just such a result. Ultimately, the remaining employers would be unable to maintain adequate funding and the beneficiaries of the Trusts  the retirees  would be the ones who suffer. The Court is unconvinced that this is the result intended when the evergreen clause *675 was negotiated. The Court declines to bind the Trusts to the assertions made in the pleadings in four relatively minor withdrawal liability cases filed years ago.

III. CONCLUSION
The Court has carefully considered the evidence and arguments of all of the parties to these cases and of the amicus curiae. Because the language of the evergreen clause is susceptible to different interpretations, the Court has considered extrinsic evidence of the intent of the clause. This evidence has convinced the Court that, despite the position taken by the Trusts in early litigation, the intent of the clause was to create a continuing obligation to contribute for those employers who elect to participate. Notwithstanding the defendants' arguments to the contrary, the Court is confident that federal labor policy would not condone dishonoring this intent, as expressed in the evergreen clause and its negotiating history. Because the Court has reached these legal conclusions, and because the parties agree that there are no material issues of fact in dispute, the Court shall, by accompanying Order, grant summary judgment in favor of the plaintiff Trusts in Civil Action Nos. 88-969, 88-3716, and 91-3241, and for the defendant Trusts in Civil Action No. 89-2833.
NOTES
[1] On December 18, 1991, the Judicial Panel on Multidistrict Litigation transferred the Rawl case from the Southern District of West Virginia to this Court because it involves questions of fact and law in common with the cases currently pending here. The cases were given Multidistrict Litigation Number 886. At the time of the transfer, cross motions for summary judgment in the Rawl case had been fully briefed and argued before Judge Robert J. Staker of the Southern District of West Virginia. After the transfer, the defendants in the Rawl case moved this Court to permit additional oral argument on its pending summary judgment motion. The Court has carefully reviewed the briefs and the transcript of the hearing before Judge Staker and does not find any need for additional oral argument. Because the issues and arguments in the Rawl case are sufficiently similar to those in the cases already pending before this Court, the Court hereby consolidates the Pittston, P & M, Pierce, and Rawl cases for the purpose of this Memorandum Opinion.
[2] The cases brought by the Trusts are styled as actions for a declaratory judgment that defendants Pittston, P & M, and Rawl are obligated to make contributions required under the National Bituminous Coal Wage Agreement of 1988 (NBCWA). ERISA provides that a participant, beneficiary, or fiduciary of a plan covered by the Act may bring a civil action:

(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan; 29 U.S.C. § 1132(a)(3). The trustees bring the actions in their fiduciary capacities.
LMRA provides that suits for violations of contracts between an employer and a labor organization may be brought in any district court of the United States. 29 U.S.C. § 185(a).
[3] Sprouse Creek Processing Company, Inc., Rocky Hollow Coal Company, Inc., Big Bottom Coal Company, Inc., Tall Timber Coal Company, and P.M. Charles Coal Company were merged into Rawl Sales and Processing Company on November 3, 1989.
[4] The P & M and Pierce cases involve only the 1950 Trusts, while the Pittston case involves both 1974 Trusts and the 1950 Benefit Trust. The Rawl case involves all four Trusts.
[5] The 1950 Trusts provide pensions and benefits for miners who retired prior to 1976, while the 1974 Trusts provide pensions and benefits to those who retired in 1976 or thereafter.
[6] P & M denies that its 1984 collective bargaining agreement with the UMWA was a "me-too" agreement. This will be discussed later in this Memorandum Opinion.
[7] At that time, the PCG companies were members of the BCOA. They have since withdrawn from the BCOA and entered into a separate agreement with the UMWA, the 1990 UMWA/PCG Agreement. This agreement occurred after a lengthy and bitter strike.
[8] After the 1981 NBCWA expired, the Rawl Companies engaged in a lengthy and acrimonious labor dispute, which finally resulted in the execution of new collective bargaining agreements with the UMWA in 1988.
[9] This Memorandum of Understanding also contained a so-called "poison pill," which provided that as long as the Trusts approved the 1990 Agreement, the PCG companies would continue to contribute to the 1974 Trusts, but at a lower rate than that required by the 1988 NBCWA. Because the Trusts did not approve the Agreement, Pittston argues that the PCG companies have no further obligation to contribute to the 1974 Trusts.
[10] The 1988 UMWA/P & M Agreement also contained a poison pill similar to that contained in the UMWA/PCG MOU.
[11] In the Pittston, P & M, and Pierce cases, which have been pending in this Court for some time, the parties have had at least two years to conduct discovery. In the Rawl case, which was recently transferred here from the Southern District of West Virginia, the parties have not yet conducted discovery. Nevertheless, much of the extrinsic evidence produced in the Pittston, P & M, and Pierce cases is relevant to the Rawl case. Thus, the Court will consider this evidence for the purpose of deciding all four summary judgment motions, and will not permit further discovery by any party to any case at this time.
[12] Defendants argue that Connors v. Barrick Gold Exploration, Inc., 745 F.Supp. 747 (D.D.C. 1990) (Revercomb, J.), aff'd, 946 F.2d 1564 (D.C.Cir.1991), prohibits reliance on extrinsic evidence. This is too broad a reading of that case, in which the court noted that it should consider only the provisions of a collective bargaining agreement, and not extrinsic evidence, if the provisions "are clear and unambiguous on their face." Id. at 747. Because the Court has already determined that the provisions of the evergreen clause and the 1984 collective bargaining agreements are not "clear and unambiguous," the Court may properly rely on extrinsic evidence.
[13] Pittston does not make an argument over the relevant evidence beyond arguing that no extrinsic evidence should be considered. Presumably this is because the PCG companies were signatories to the 1984 NBCWA, thus the intent of the BCOA and the UMWA is necessarily the relevant intent.

Rawl also does not make a separate argument about the scope of extrinsic evidence to be considered.
[14] P & M argues that its 1984 North River Agreement was not a me-too agreement. This argument is unpersuasive because in P & M's own motion for summary judgment, it admits that

In the 1984 North River Agreement, the company adopted most of the terms stated in the collective bargaining agreement between the UMWA and the Bituminous Coal Operators Association ("BCOA"), called the 1984 National Bituminous Coal Wage Agreement ("1984 NBCWA").
P & M Memorandum in Support of Motion for Summary Judgment (P & M Summary Judgment Memorandum) at 4. The only terms that differed from the NBCWA regarded regular vacation periods, Christmas/New Year's shutdown, no reimbursement for advanced health premiums, frequency of paydays, bereavement pay, and protective gloves. Id. at n. 1. These differences do not appear to be significant enough to take the 1984 North River Agreement out of the realm of me-too contracts.
[15] Even if the Court wanted to consider evidence of the intent of P & M and the UMWA in negotiating the 1984 North River Agreement, P & M has supplied the Court with no such evidence. P & M instead argues that the language of the North River Agreement is clear and the Court should interpret it by looking at the entire agreement. Pittston argues that if the Court considers the Trusts' extrinsic evidence, then it must permit Pittston to conduct discovery in order to respond. Pittston argues that rule 56(f) should be applied liberally to permit such discovery. Pittston has had two years to conduct discovery, knowing that the Court would likely consider extrinsic evidence. Discovery thus far has been voluminous to say the least. The Court will not now reward Pittston's decision to squander its time by granting it another lengthy period of discovery.

With respect to Rawl, which also seeks discovery if the Court considers extrinsic evidence, this Court finds that the evidence already submitted in connection with the other pending cases and with the Rawl case is sufficient for this Court to make a determination about the meaning of the evergreen clause.
[16] Indeed, this appears to be what may have occurred. For instance, according to the Trusts' unrebutted allegations, there are over 2,000 retirees of PCG companies still receiving benefits from the Trusts.
[17] There is no reason that the defendant employers should not have been able to find evidence of contrary negotiating history, if any was there to find. The UMWA has been actively involved in these cases from the very beginning, as amicus curiae in the Pittston and Rawl cases and as the plaintiff in the Pierce case. The UMWA was a negotiating party when the evergreen clause was agreed to in 1978. Certainly if the UMWA had evidence that the clause was not intended to create a continuing obligation, it would have introduced such evidence in these cases.
[18] The proposal under consideration had been made by A.T. Massey Coal Company, the parent company of Rawl.
[19] In its briefs, P & M cites several cases in which courts have purported to rule that the obligations of an employer pursuant to a collective bargaining agreement expire with the termination of the collective bargaining agreement. As a general proposition, this is indisputably true. However, as the parties have already agreed, an obligation may extend beyond the termination of the collective bargaining agreement if that intent is clearly expressed in the terms or negotiating history of the agreement. In the cases cited by P & M, none of which involved the interpretation of the evergreen clause, the courts looked at the negotiating history and determined that there was no intent for the obligations at issue to extend beyond the expiration of the agreement. These cases have no real relevance to the cases now before the Court because they involved entirely separate obligations with entirely separate negotiating histories. These cases include: District 29, United Mine Workers of America v. Royal Coal Co., 768 F.2d 588 (4th Cir.1985) (determining that employer's obligation to provide certain benefits directly to retirees expired with termination of collective bargaining agreement); District 17, United Mine Workers of America v. Allied Corp., 765 F.2d 412 (4th Cir.) (en banc) (implying the same) cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985); United Mine Workers of America International Union v. Nobel, 720 F.Supp. 1169 (W.D.Penn.1989) (same), aff'd, 902 F.2d 1558 (3d Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991); Box v. Coalite, Inc., 643 F.Supp. 709 (N.D.Ala. 1986) (same).
[20] The Island Creek cases are currently on appeal.
[21] The only cases cited by defendants in which withdrawal liability was sought involved the cessation of contributions in 1981 upon the expiration of 1978 collective bargaining agreements.